THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Appellant, *v.* BENJAMIN F. PARKS, Appellee.

### APPEAL FROM KANE.

Railroad charges for freight and passengers must be uniform, without favor or prejudice, of the several classes established by the company; these may be changed from time to time, at the pleasure of the company.

Passengers who neglect to purchase tickets at stations, before embarking on cars, may be charged additional fare, if proper conveniences and facilities are furnished them for procuring tickets.

If a passenger on a railroad pays only from one station to another, without a ticket, he may be compelled to pay an extra charge at each station, as a new contract between the company and the passenger is thus made at each station.

If a passenger refuses to pay the fare required by the tariff of the railroad company, he may be ejected from the cars at any regular station, not elsewhere.

Although a party who is ejected from a car elsewhere than at a station, for non-payment of fare, sustains an injury, for which he may bring an action, yet, where there is no improper conduct on the part of the agents of the company, nor any peculiar circumstances to justify it, a thousand dollars will be held to be excessive damages for the act.

PARKS, who is an attorney, sued the appellant in case, averring that the appellant was the owner of a railroad passing from Aurora, in Kane county, through Batavia to Junction, in Du Page county; that he took passage on board the cars of

the company from Aurora to Junction aforesaid, and was wrongfully expelled therefrom by the conductor of the train. There were three counts in the declaration, not materially variant; the third count averred that Parks was expelled from the cars at a place which was not one of the usual stopping places of the trains of the appellant's cars.    To this declaration there was a plea of the general issue, at February term, 1857, of the Kane Circuit Court, I. G. Wilson, Judge; there was a trial by jury, and a verdict and judgment for the plaintiff below for one thousand dollars.

A motion for a new trial was denied.

The testimony of the case was substantially as follows:

That on the trial of said cause in the court below, the plaintiff, to sustain the issue on his part, introduced as witness, A. B. Fuller, who testified that during the May term of this court, he went on board a train at Aurora for the purpose of coming to court; found plaintiff on board, a little before 7 o'clock A. M.; I let plaintiff have fifty cents; he gave it to conductor, who gave him back twenty cents; when we got to Batavia it rained; conductor said, better go on to the Junction; Montony stood on the platform; we got on to go to the Junction; the conductor came along collecting fare; got to plaintiff, who was near the stove; plaintiff handed him twenty cents; conductor said it was not enough; plaintiff said he had no more; would pay another time; some further conversation, and conductor told plaintiff he must pay his fare, or get off the train; or that he would have to get off; plaintiff said "very well, if he put him off he would do so under protest;" witness said he would pay the fare; did not offer it to any one in particular; addressed myself to plaintiff; it was from five to ten minutes from the time we left Batavia when the train stopped; when train had stopped, plaintiff said if he went off he would have to put him off; the conductor put his hand on plaintiff's shoulder or arm, and both walked out the door together; heard no further talk; saw plaintiff standing on the ground, in a low wet place, within a half a mile of Batavia; saw plaintiff next at court, two or three hours after.

On cross-examination, witness said: There was no bodily force used by conductor; plaintiff talked no louder than usual; perhaps a little louder, before they got through; was about ten feet from plaintiff; I paid twenty-five cents fare from Batavia to Junction; the price of a ticket is twenty cents; fare from Aurora to Batavia is thirty cents, if paid on the cars—a ticket is twenty-five cents; that had been the established rates for some time; I offered plaintiff the money to pay his fare; he said no, the matter had gone too far; he would not take the money; this was the Aurora accommodation train; some pas-

sengers got on at Batavia—ticket office near the cars; cars started soon after conductor suggested to go to Junction; it was raining quite hard.

R. G. Montony testified: I was on the train; Parks, Fuller and Hall were on; we came to Batavia; the conductor remarked, as he was stepping on to the platform at Batavia, "You had better go round by the Junction;" he made the remark, as I supposed, because it was raining; as the conductor was stepping on the platform, I was in the doorway, plaintiff on the platform or about getting on; the next time I noticed plaintiff, conductor was standing by him in the aisle; they had loud conversation; the conductor was Satterfield; he said to plaintiff, if he would not pay his fare he must get off; plaintiff said he would; Satterfield said get off; plaintiff said no, if I get off, I go under protest; plaintiff got up; conductor put his hand on his arm or shoulder; they went to the door; plaintiff got off on the north side; door was opened and train had stopped; it had rained that morning; roads bad; plaintiff got off in a cut, fifty or eighty rods from Batavia station; it was muddy and wet.

Witness said there was no violence used. The conductor said if he wouldn't pay his fare he would have to get off, or must get off—can't remember the words; think the conductor used mild language. It was higher ground where the plaintiff got off than at the depot.

T. C. Morse testified: The first cut east of Batavia is between one-quarter and one-half mile from Batavia; saw plaintiff at court that day about 9 o'clock, A. M.; the railroad company always charge five cents less for tickets than on the cars; never had any difficulty in procuring tickets; rainy and muddy that morning.

J. L. Hanchett testified: Was the engineer that located road from Batavia to the Junction; is five miles and nine-tenths; is little over seven miles from Aurora to Batavia; know of no regular stopping place between Batavia and Junction; it does not exceed one-half mile ·from the east end of the first cut to Batavia; the second cut is forty rods beyond.

E. G. Dixon: Am station agent at Batavia; was there on said morning; train stopped twelve or fifteen minutes; took on and left some cars; there is, and was, a regular tariff of fare posted in the office; we keep office open to sell tickets till train is due; the first cut is forty or fifty rods from the station house.

On cross-examination witness said: I was ready to sell tickets that morning till the train left—frequently sell tickets after the regular train, if not engaged otherwise.

This was the testimony of the plaintiff.

Defendant introduced Alonzo Satterfield, who testified: I have been conductor on this road about two years; was that morning; plaintiff had frequently rode in cars; had collected fare from him to Aurora, to Junction; I hold in my hand the tariff; these have been the rates for eighteen months past, from Aurora to Batavia; fare paid on cars is thirty cents; from Batavia to Junction is twenty-five cents; plaintiff had before that frequently paid fare from Aurora to Batavia, and had objected to paying the five cents; we were at Batavia about fifteen minutes that morning; took on and left cars; plaintiff came on at Aurora, and paid fare, thirty cents, to Batavia; he handed me two quarters; I gave him back twenty cents; it was raining when we left Aurora; the passenger car stopped at door of the office; I left the car to attend to switching; we got away as soon as possible; I stepped into car as soon as they were in motion; I had taken two fares, and two or three tickets; had taken fare from Mr. Fuller before I came to plaintiff; he sat next the stove; I entered at the forward end of the car; plaintiff handed me two ten cent pieces; I told him that was not the fare; he said it was all the change he had; I told him the company furnished me change, and I would change a bill; he asked what the fare was from Aurora to Junction; I told him; he said, you have that amount; I said, you are a passenger from Batavia to the Junction, and I must lose or stand the five cents; he said, you can do that; I then said, if you have not money to pay your fare you had better get off; he said, stop your train, and I will get off; I then stopped the train, and said to him, the train has stopped Mr. Parks; he said he should not get off unless he was put off; I said to him, Mr. Parks, you don't want me to throw you off, do you? I told him I would walk to the door with him; I laid my hand on his shoulder, and we went out together; he got off; I signalled the engineer to go on; no force was used; I laid my hand on his shoulder, and took it off; walked behind him to the door; the train was about forty rods from the depot, going slow; it is up grade and a curve; had not got under much headway before train was stopped; Mr. Fuller told plaintiff he would pay his fare; plaintiff said he should not; when the train stopped, I am under the impression the engine was just entering the first cut.

On cross-examination, witness said: I have been in the employ of the company two years; the first crossing is west of the cut; we were not up to the grove, we stopped at the first crossing; it was a rainy morning; Montony and Fuller were on board; don't recollect saying anything to either of them; did not tell plaintiff I should put him off.

Mr. Coffin testified : I was on the train at the time, in May last ; was on seat with plaintiff, next the stove ; the conductor came along ; plaintiff offered him twenty cents ; conductor said, not enough, five cents more ; plaintiff said he had paid the extra five cents once ; conductor said the fare from Batavia to the Junction was twenty-five cents ; plaintiff said that was all he had, and he must take that or trust him ; the conductor said, if you can't or won't pay your fare, you had better get off ; conductor went forward and stopped the train ; plaintiff got up and stood in passage way ; plaintiff said he should not get off, unless put off ; Fuller offered to pay the fare, but plaintiff refused to let him, and said he went off under protest ; they went out together as far as door ; conductor asked plaintiff if he wanted him to throw him off ; conductor said he must get off.

William H. Hawkins testified : He had been in the employ of defendant some three years ; tariff of fare now exhibited has been the rate of fare since October, 1855 ; copies of this have been posted up in all the stations ; there was one up at Aurora and Batavia in May last.

SEDGWICK and WALKER, for Appellant.

O. D. DAY, E. LELAND and W. H. WALLACE, for Appellee.

CATON, J.   Several questions of considerable public importance arise upon this record, and have been considered by this court.   The railroad company has the right, by its charter, to fix the tariff or fare, which it shall receive for carrying passengers and freight upon its road.   These charges, however, must be uniform ; that is, the charge should be the same for all persons similarly situated, and for all freights of a like kind and quality, for a given service.   They may divide passengers and freights into classes, with descriptive distinctions, and charge different rates for different classes, for a given service, but the charge should be uniform upon all persons and freights embraced within each class.   Thus may every one know what he has to pay, beforehand, for passage or freight, by inspecting the table of classes and charges fixed by the company. They may not say that they will charge A. twice as much as they do the public in general.   While they show favor to individuals or classes, by carrying them free or for half price, if they choose, they cannot be allowed to arbitrarily oppress an individual, by charging him an unusual price, simply because it is him.   Also, tariffs of charges may, under the same rule of uniformity, be changed at the pleasure of the

company. Nor do we think it unreasonable or unjust that the company should charge more for passengers who neglect to get tickets, and, in consequence, compel the conductor to collect their fares in the cars. This is but a reasonable penalty for the neglect of the passenger, and a just compensation to the company for the additional inconvenience to which they are subjected by being compelled to receive the fare by the hands of the conductor. That it is sensibly and appreciably more to the advantage of the company to have their fares paid to their station agents, who issue tickets therefor, than to their conductors, our common observation has convinced us. But to justify the company in making this discrimination in the fare against the passenger who neglects to purchase a ticket at the company's office, the company must see to it that the fault was not that of its own agent, instead of the passenger. To justify this discrimination, every reasonable and proper facility must be afforded the passenger to procure his ticket. They must furnish a convenient and accessible place for the sale of the tickets, with a competent person in attendance ready to sell them, which should be open and accessible to all passengers, for a reasonable time before the departure of each train, and up to the time of its actual departure, so that it shall really be a case of neglect, and not of necessity, on the part of the passenger, and not the fault of the company. If a company will keep its ticket office closed till a crowd of clamorous passengers have gathered around, so as to make it dangerous or inconvenient for females or infirm persons to get tickets, surely the fault is not theirs, but the company's, if they do not procure tickets, and, under such circumstances, to charge them more than the price established for tickets, would be but an imposition and an outrage which the law cannot sanction.

We have been led to these suggestions upon the reasonable facilities to be afforded to the passengers to procure tickets, not only from very common complaints, which sometimes, no doubt, are well founded, that agents too often delay opening their offices till too near the time for the departure, but the evidence in this case shows that the usual habit of the agent at Batavia, the place where the passenger should have got his ticket, was such as to have prevented the plaintiff from procuring a ticket in this case. He swears that his rule was to keep his ticket office open till it was time for the train to arrive, and that he did not keep it open till the departure of the train, unless he chose to, or if he had anything else to do. Had such been the case on the morning in question, it would have been impossible for the plaintiff to have procured a ticket, for he came in on the cars, and, consequently, could

30

not well buy a ticket at the office before the arrival of the train. Had he gone to the ticket office and found it closed, we should not hesitate to say that the fault was the ticket agent's, and not his, and that, having done all he could to procure a ticket, he was entitled to be transported at the ticket fare. Otherwise, the company would be allowed to take advantage of its own wrong, or that of its servant, and make the party without fault pay them for it. The evidence, however, in this case shows that the ticket office was open, and the agent ready to sell tickets during the whole time the train was at the station, so that it was the fault of the plaintiff, and not of the company, that he did not procure a ticket, if it was his duty to procure one. This at once leads us to that question, as arising out of the facts in this case.

It appears that the plaintiff took passage on the cars at Aurora, without a ticket, and paid the conductor, when called on in the cars for his fare, the regular price to Batavia, to which place he took and paid for a passage. He paid the five cents more than the price of a ticket, for the same passage, according to the rules established by the company. No complaint or remonstrance seems to have been made to the payment of the five cents more than the price of a ticket for the passage to Batavia, which was the destination for which he first started. While the train remained at Batavia, the plaintiff concluded to go on to Junction, which is the next station, and took passage for that point, without having obtained a ticket. After the train had started, the conductor applied to the plaintiff for his fare, who tendered him twenty cents, which was the price of a ticket, but the conductor demanded of him twenty-five cents, which was the price fixed by the rules of the company for the fare from Batavia to Junction, when it is paid to the conductor. The plaintiff claimed that, as he had already paid the extra five cents, on his passage from Aurora to Batavia, he was not bound to pay an additional five cents on the route from Batavia to Junction, while the conductor claimed he must pay the conductors' fare in both cases. In this we have no doubt the conductor was right. At first the plaintiff took passage for and paid his fare to Batavia. When that journey was accomplished, that contract was at an end, and all connection and responsibility between the parties, so far as the first payment, or the contract growing out of it, was concerned. When the plaintiff again got on to the cars at Batavia, and started for Junction, a new journey was commenced, as independent of the other, which had already been fully performed, as if he had come over that part of the road the day before, or even as if he had never been on the cars of the company before. A new contract had to be made as much

as if another passenger had got on at Batavia, instead of the plaintiff. For the two passages the conductor had to make two reports and separate entries, as much as if the two journeys had been performed by two passengers. The conductor, then, was right in demanding the regular fare established by the rules of the company, and the plaintiff occupied the position of one upon the cars refusing to pay the regular fare, which, by taking his seat in the cars, without a ticket, he had impliedly agreed to pay. And the question then arises, What were the rights of the parties under such circumstances? What was it then the duty of the conductor to do?

These, we think, are definitely established by the thirty-fourth section of the law providing for a general system of railroad incorporations, which is this:

"If any passenger shall refuse to pay his fare or toll, it shall be lawful for the conductor of the train, and the servants of the corporation, to put him out of the cars at any usual stopping place the conductor shall select."

It is objected, first, that the company had the right to remove persons from the cars who refuse to pay their fare, before the passage of this law, and as this statute does not, in terms, forbid the putting out of such a person at any convenient and safe place other than a usual stopping place, the right which is claimed formerly to have existed, to put the passenger out at other than usual stopping places, still remains unimpaired by the act. This we do not think a sound construction of the act. It was the evident intention of the legislature to regulate the subject of which the section treats, without reference to the question, whether it abridges or enlarges previously existing rights. It means this or it means nothing. Such, we have no doubt, is the sound construction of the act.

It is next objected that, as this company was incorporated, not under this general law, but by a special law, passed long before, we ought not to hold that it was the intention of the legislature to make this section applicable to it. This question of intention is settled by the last section of the same act, which says:

"All existing railroad corporations within this state shall respectively have and possess all the powers and privileges, and be subject to all the duties, liabilities and provisions contained in this act, so far as they shall be applicable to their present conditions, and not inconsistent with their several charters."

This thirty-fourth section is certainly as applicable to one road as another, and if the legislature had the right to impose such a regulation upon companies already in existence, there can be no doubt that it intended to do so. We held, in the case of *The People ex rel.* v. *Wilson,* 17 Ill R. 157, that, under

this last section, this very railroad company might claim a benefit under this same act. And, in the case of *Galena and Chicago Union Railroad Company* v. *Loomis*, 13 Ill. R. 548, we held that the thirty-eighth section of the same act was applicable to and binding upon that company. That section requires each locomotive to be provided with a bell or whistle, which shall be sounded at road crossings. That company was incorporated by a special law, before the passage of this general law, and hence was situated, in that respect, the same as this company. There is nothing in the charter of this company which says anything about its right to put passengers out of its cars for refusing to pay fare, but that right is claimed as an incident to, and as a means of enforcing, the right to collect fare, so that the regulation in question does not interfere with any express grant of power contained in the charter. It does not interfere with the right to collect toll from passengers, for they may demand the toll of all persons before they allow them to take their seats in the cars, or, after the service is performed, they may sue and recover the fare of the passenger. But after the company has allowed the passenger to take his seat in the cars, and started with him, without demanding the toll, and without objection, it provides that he shall not be thrust out, except at a regular stopping place. This was, no doubt, deemed essential, by the legislature, to the safety of the traveling public, rather than leave it discretionary with every conductor to say arbitrarily what is a safe and proper place to put the passenger off; and when we reflect that, among the great multitude of conductors necessarily employed throughout the state, with the utmost caution on the part of the companies, it is almost inevitable that some will want discretion, while others may be influenced by passion, or, worse still, an exaggerated notion of their authority, and a morbid ambition to display it, we cannot say that the legislature acted unwisely in prohibiting them altogether from putting off passengers, for the non-payment of fare, at other than usual stopping places. The case may and, no doubt, often will happen that a person may, very innocently and unintentionally, find himself without the means of paying his fare, as where the money he has unexpectedly turns out to be uncurrent, or, when he looks for his money to pay his fare, he finds he has been robbed.

I venture the assertion now, that if the conductors were to adhere to the positive requirements of our statutes, which prohibits the receiving of bills of banks out of the state of less denomination than five dollars, they would, in every train, find more or less persons of respectability and character who had taken their seats, without a doubt of their ability to pay

their fare, who were entirely unable to do so; and yet, in refusing to take such money, no one can doubt that the conductor would be exercising a strict legal right, and, I may say, duty, for it is the duty of all to obey that, as well as all other laws, so long as it remains in force. It was impossible for the legislature to distinguish between such cases and those where the passenger fraudulently takes his seat, and then refuses to pay; and rather than leave it to the discretion of the conductor, it was deemed proper, for the protection of the traveling public from even occasional abuse, to provide that passengers should only be put off at usual stopping places, for refusal to pay the fare, for that is the effect of the provision.

This is complained of in the argument as a hardship, and as practically compelling the company to carry all persons who take their seats from one station to another, for ordinarily the train could not be run back to the station where the passenger got on without getting behind time. Under the present system of allowing all persons to take their seats in the cars without tickets, and without paying their fare, this may be so, and such an effect is certainly to· be regretted; but it is not impossible to obviate the difficulty, by requiring pre-payment, although it may not be improbable that the introduction of such a system in this country, at the present time, would be attended with great difficulties. But, be this as it may, we cannot doubt the power of the legislature to pass the law in question, if they deemed the public safety required it. The result is that, in this case, the conductor had a right to remove the plaintiff from the cars, because he refused to pay the fare which he was authorized to demand; but he was not authorized to put him off at the place where he did, which was not a usual stopping place, but from forty rods to half a mile from the Batavia station. The statute made it his duty either to run back to that station, or to take him on to the next. Had he taken him on to Junction, which was the next station, the company would have had a right of action for the fare, which, however inadequate in fact, would be all the relief the law could afford in such a case,·as well as in all others where services are rendered, for which the party refuses to pay the just compensation.

For putting the plaintiff off the train, at a place not allowed by law, a technical wrong was done him, for which he undoubtedly had a right to bring this action, and to recover such damages as he sustained for the wrong done him. The jury allowed him one thousand dollars for those damages, which the circuit court refused to set aside, and this decision is also assigned for error. We cannot hesitate to say that the damages allowed are grossly, not to say outrageously, excessive. Although, in a case of this kind, this court will interfere

with a verdict with great reluctance, yet we will not hesitate to do so, where it is apparent, at first blush, that the jury have misapprehended the law of the case, or misunderstood the facts, or else have been influenced by their passions or their prejudices, rather than the law and the facts. It is not the duty of courts to enforce the arbitrary edicts of juries; but it is their duty to firmly and fearlessly stand between the party and the jury, whenever it is manifest that the party has been been made a victim to their prejudices. In this class of cases great latitude should, no doubt, be · allowed to juries in their estimate of the damages, but to this there must be a limit; and should we refuse to interfere in this case, it would be equivalent to saying to juries, in all cases of this kind, we will shut our eyes to the facts of the case, and let you work your will with all parties placed in your hands. Now, do with them as you please; we will not interfere.

What are the facts which the jury were bound to consider in estimating the amount of damages to which the plaintiff was entitled? The plaintiff had refused to pay the fare, which it was his duty to pay, and it became the right and the duty of the conductor to remove him from the cars. This he did in as kind and courteous a manner as practicable, without violence or harshness, and without insult or contumely. The refusal of the plaintiff to pay the fare was not a matter of necessity, for a friend offered to pay the additional five cents, which he would not allow to be done, but he chose rather to vindicate what he, no doubt, supposed was his right, in which, however, we have seen he was mistaken, for the controversy between him and the conductor was about the five cents, and not about the place where he should be left. His refusal to pay his fare was from his will, and not from want. He chose rather to be put off the cars than to allow another to pay the disputed five cents, which he was, in law, bound to pay. Thus, by his own illegal act, he subjected himself to all the mortification consequent upon the transaction, for the mortification consists in being removed from the cars, and not in the place of removal. A sensitive mind would have been quite as much pained had the train run back to the depot, and he had there been expelled in the presence of by-standers, as well as the passengers, as to have the removal take place, say eighty rods, from the depot; and yet had the conductor done so, no wrong would have been done to the plaintiff, and he would have had no cause to complain. Of what, then, could he complain? In what respect were his rights violated? In this alone, that he was put off the cars, say eighty rods from the depot, instead of at the depot. He was entitled to recover whatever damages which he sustained by being put off at that

place, instead of at the depot.   But it rained at the time, and he had to walk back in the wet.   There is no evidence that he took a cold, or in any way became indisposed in consequence, but, on the contrary, the evidence shows that he was found, some few hours afterward, at his place in court at Geneva, some two or three miles from Batavia, so that there were no special damages resulting from that, more than the discomfort and inconvenience of it.   There is no evidence showing malice on the part of the company or the conductor. He performed his unpleasant task with evident reluctance, and without ostentation or arrogance, or display of authority, and, so far from their being evidence of enmity between the parties, the testimony would lead to the conclusion that a friendly relation existed between them.

From the whole evidence in the case, we cannot avoid the conclusion that each supposed he was right in the dispute about the amount of the fare, and each chose to stake the consequences, and take the responsibility of acting upon his own judgment; and it turns out that the plaintiff was wrong, and the conductor was right.   Nor is there anything in the case to lead to the conclusion that the conductor put the plaintiff off where he did, instead of a usual stopping place, for the purpose of annoying him or discommoding him, when he knew that it was his duty to take him to some regular stopping place.   No question or controversy was made as to the place, but the whole question between them was as to the right.   As a matter of law, it was, no doubt, the duty of the conductor to have known of this statute, and to have obeyed it; but it does not follow that his ignorance and violation of it are evidence of malice, for which smart money or exemplary damages should be inflicted upon the company.

Now, in view of all these circumstances, can any impartial and unprejudiced mind for a moment tolerate the supposition that the plaintiff was entitled to one thousand dollars damages, when, by his own wrongful act, he had subjected himself to the liability of being expelled from the cars, rather than allow a friend to pay the fare for him, which it was his duty to have paid; and the only real ground of complaint which he has is, that he was put off a short distance from the depot, instead of at the depot?   The very statement of the proposition is startling, and carries conviction to the mind at once, that the jury were led to find their verdict, not from the facts alone and the law, as applicable to those facts.   It may be, and probably is, the case that the jury supposed that the conductor was wrong in the amount of his charge, and that they viewed the plaintiff in the light of a sacrifice to principle, and that he had been outraged, when manfully resisting oppression and wrong.

Without some such considerations as these, we cannot suppose that the jury honestly arrived at the verdict which they rendered. But such a view of the case, we have seen, was not warranted by the law and the facts. The mere supposition or belief of the plaintiff himself, that he was all in the right, and that he was submitting to wrong for the sake of defending a principle, did not entitle him to that position when he, in fact, was in the wrong. The honesty of his purpose could not put the other party in the wrong when he was, in truth, in the right.

This verdict cannot upon principle be sustained. To uphold it, would not only be doing a great wrong to the defendant, in this particular case, but, as a precedent, would be doing an infinitely greater wrong to the community, who might suffer by it.

This judgment must be reversed and the case remanded, upon the ground alone that the damages are excessive.

*Judgment reversed.*