### ZION v. SOUTHERN PAC. CO.

(Circuit Court, D. Nevada. March 18, 1895.)

No. 585.

CARRIERS—EJECTION OF PASSENGER—EXCESSIVE DAMAGES.

> Plaintiff was ejected from a train at a station, but without violence, because the conductor was not satisfied as to his identity with the original purchaser of the ticket, his signature being different from the one made at the time of purchase. Plaintiff offered to write his name again the same as it was on the ticket, but the conductor refused. The conductor refused to return the ticket, and plaintiff was put off by the conductor on the next division. The additional expense caused was slight, and the jury was instructed that exemplary damages could not be given. *Held*, that a verdict of $1,700 was so excessive as to indicate prejudice and bias.

Action by J. M. Zion against the Southern Pacific Company for damages. There was a judgment for plaintiff, and defendant moved for a new trial.

R. M. Clarke and Charles A. Jones, for plaintiff.
J. L. Wines and W. E. F. Deal, for defendant.

HAWLEY, District Judge (orally). This action was brought by the plaintiff upon the 5th day of December, 1893, to recover damages alleged to have been sustained by reason of his having been wrongfully ejected from a passenger car on defendant's railroad at Reno, Nev., on April 3, 1893. The case was tried before a jury, and a verdict rendered in favor of plaintiff for $1,700. Defendant moves for a new trial upon the ground that the verdict is so excessive as to indicate passion, prejudice, and bias upon the part of the jury.

The facts of the case are as follows:

The plaintiff is 46 years old, a married man, and resides in Indiana, and is engaged in farming and growing fruits. He had a contract with D. Appleton & Co., book publishers, for the sale of their Universal Geography at points west of the Rocky Mountains, and had been engaged in that business, off and on, for about 15 years. On the 18th day of October, 1892, he purchased a tourist ticket in Chicago to San Diego and return, for which he paid $104, which ticket was good over the road of defendant from Ogden,

Utah, to Los Angeles, Cal., and return, subject to the following, among other, conditions:

"(5) It is not good for return passage unless the holder identifies himself as the original purchaser, to the satisfaction of the authorized agent at the return starting point on or before date of departure returning; and when officially signed, dated in ink, and duly stamped on back hereof by said agent, this ticket shall then be good only to date canceled in margin. [The time canceled in the margin had not expired.] (6) The holder will identify himself as the original purchaser of this ticket by writing his name, or by other means, if necessary, when required by conductors or agents."

The ticket, upon its face, contained a description of the passenger, as to sex, size, age, color of eyes, and character of beard, which, in all these particulars, answered the description of the plaintiff. The plaintiff traveled upon this ticket from Chicago to San Diego unmolested. Upon his return he complied with the fifth condition thereof. His signature on the ticket at the time of purchase at Chicago and upon his return at San Diego were substantially alike. He traveled upon his return on the defendant's road from Los Angeles to Lathrop. There he got a stop-over check; paid his fare from Lathrop to Berkley. The ticket entitled him to stop-over privileges. After remaining in that city for about one month he bought a ticket to Sacramento, and checked his trunk to Colfax. At Sacramento he presented his regular ticket on the main line of the defendant's road, over which he was entitled to ride. The conductor took off the coupon "Los Angeles to Ogden." After leaving Sacramento, plaintiff asked the conductor for a stop-over check at Colfax, as he wished to go to Nevada City, Cal. The conductor took his ticket, and he was asked to sign his name on the conductor's memorandum book, which he did. He signed his name with a different signature from the signature on the ticket. The plaintiff testified that when he signed his name at Chicago it was at a small window, with little space, and the initials "J. M. Z." were lettered, while in writing his name for the conductor he wrote the initials in the usual way. The conductor came back, and informed plaintiff that he could not issue a lay-over on that ticket. Plaintiff said: "Is that so? Why not? That is pretty rough on me." The conductor said, "It ain't the same name that is on the ticket." Plaintiff said: "Surely, you are mistaken. The name on the ticket is J. M. Zion, and my name is J. M. Zion, and I wrote my name on that piece of paper. Do you doubt it? There might be some difference in the style of the signature, but that is my name; and, if you will please hand me back my ticket, I will write my name the same as it is on the ticket. Then you can see whether it is my name or not." The conductor said, "No, you can't fool me that way." Plaintiff then said, "Probably you think I am lying about it, or forged it." The conductor replied, "It looks like it." This conversation occurred in the presence of several passengers. The conversation continued for some time. The conductor refused to return the coupon for Ogden, or to give a stop-over. When the train arrived at Colfax the conversation was renewed. Plaintiff got off the train with his valise and hatbox, and, at the request of the conductor,

wrote his name on loose slips of paper, two or three different ways, but none of the signatures bore a close resemblance to the signature on the ticket. There was considerable excitement. The bell was ringing, and passengers crowded around to see how the matter would terminate. The train commenced moving, and the conductor said, "They are just going to take water." Plaintiff hurried up, and succeeded in getting in the last coach. After the train left Colfax the conductor said to plaintiff:

"I have received a dispatch from Mr. Goodman, general passenger agent of the road, that, if I am satisfied you are a scalper, not to allow you to proceed. I will have to put you off unless you pay your fare."

Plaintiff declined to pay his fare, stating that he had paid it once, and explained to the conductor under what surroundings he had signed the ticket in Chicago. He told the conductor that he did not want any trouble, and asked him to give a receipt for the coupon from Los Angeles to Ogden, which he had taken up and refused to return, so that it could be shown to the next conductor. The conductor refused to give any receipt, or to give up the ticket. This request and refusal were repeated several times. At Truckee, which is the end of the division, a new conductor came on the train. Plaintiff handed him the remaining part of his ticket, reading from Ogden to Chicago. The conductor said: "There is no transportation on that over my division. You will have to pay your fare or get off." This conductor treated plaintiff considerately and fairly. After he had taken up the ticket, he approached plaintiff and said: "What is the trouble between you and the other conductor?" What occurred thereafter is testified to by plaintiff as follows:

"I told him what had passed, where I had been, when I left my home, in Berkley, and the trouble I had had with the conductor about the signature; told him I could satisfy him that I was J. M. Zion, and was willing to do anything reasonable. Then I showed him my hatbox,—I didn't think about it till afterwards,—that the name 'J. M. Zion' was on the bottom. I showed him that. I had told the former conductor that I had put all my papers in the trunk, but I thought I would look in my valise; and in the back part I found an old letter from D. Appleton, and a shipping receipt given by the express company, and * * * a card addressed to 'J. M. Zion.' He wanted to know if there was anything else, so I took off my cuff, and showed the initials inside, 'J. M. Z.' I didn't want to get into any trouble, and said I was satisfied to do anything. I said: 'Are you not satisfied that I am J. M. Zion and entitled to ride on this train? Are you not absolutely positive that I am J. M. Zion?' He said: 'That is good evidence. I will telegraph back and find out.'"

Nothing more was said until the train arrived at Reno, when the conductor approached plaintiff, and said:

"Excuse me. I am very sorry to inform you that you will have to pay your fare, or get off the train. I don't want you to think I am acting on my own motion or judgment. I have received strict orders, and I will have to carry them out."

After further conversation the conductor took the plaintiff by the arm off the train, without using any force or violence. The plaintiff was detained in Reno two days, at an expense of $7.50.

After getting his trunk, and receiving money in answer to a telegram for funds, he paid his fare to Ogden, $29.50.

On the trial, defendant admitted that the ticket which the plaintiff had was a regular passenger ticket, which entitled him to the rights and privileges of a regular passenger upon its train between the points designated therein. It was also admitted that defendant and its agents had no right to expel plaintiff from the train, and that its act in so doing was wrong.. No exceptions were taken to the charge of the court.

As to the measure of damages, the court charged the jury: "That under the pleadings and evidence in this case the plaintiff is entitled to recover as damages from the defendant the amount paid by him for the ticket from Reno to Ogden, * * * and the amount of expenses necessarily incurred by reason of his delay at Reno. * * * He is also entitled to recover reasonable compensatory damages for being wrongfully and unlawfully expelled from the train at Reno. In estimating that amount you should take into consideration all the facts and circumstances in connection with his expulsion from the train, * * * whether any insults or indignities were at any time offered to him by the conductors or agents of the defendant, and all the facts and circumstances which occurred upon the train, and which led to his being expelled from the train." That exemplary, vindictive, or punitive damages could not be given. That the jury could only award such damages as would fully, fairly, and justly compensate plaintiff for the indignities or humiliation, if any, which he received, in addition to the actual expenses. The charge of the court is in substantial accord with the universal current of decisions upon the measure of damages in such cases. The mere fact that plaintiff was wrongfully and unlawfully expelled from the train authorized the jury to find, independent of any other proof upon the subject, that plaintiff had suffered feelings of humiliation, for which it should assess some damages; and if the expulsion is accompanied by insult, abuse, or undue violence, the jury is authorized to consider the injured feelings of the plaintiff, the indignities endured while a passenger on the train, the humiliation and wounded pride which one in his condition in life and standing in the community would naturally experience, and to award compensatory damages therefor. Quigley v. Railroad Co., 11 Nev. 351, 367; Gorman v. Southern Pac. Co., 97 Cal. 6, 31 Pac. 1112; Railway Co. v. Fix, 88 Ind. 381, 389; McGinness v. Railway Co., 21 Mo. App. 399, 411; Carsten v. Railroad Co., 44 Minn. 454, 47 N. W. 49; Railway Co. v. Chisholm, 79 Ill. 585; Railroad Co. v. Connell, 127 Ill. 419, 20 N. E. 89; Paddock v. Railway Co., 37 Fed. 841; Du Laurans v. Railroad Co., 15 Minn. 49, 58 (Gil. 29); Railway Co. v. Rice, 38 Kan. 398, 16 Pac. 817; Lucas v. Railroad Co., 98 Mich. 4, 56 N. W. 1039; Stutz v. Railway Co., 73 Wis. 147, 40 N. W. 653; Boster v. Railway Co., 36 W. Va. 324, 15 S. E. 158; Beach, Ry. Law, § 891, and authorities there cited.

Under all the facts and circumstances of this case, was the jury justified in assessing the damages at $1,700? Is the amount

awarded so excessive as to indicate passion, prejudice, or undue influence upon the part of the jury? With the exception of Bass v. Railway Co., 42 Wis. 654, which was a case of extreme wrong, abuse, and violence, where the sum of $2,500 was allowed to stand, under the peculiar circumstances of that case, my attention has not been called to any decided case where the appellate court has declined to interfere where the damages exceeded $1,000, in cases at all analogous to the one in hand. An examination of the decided cases relative to the amount of damages rendered by juries for the wrongful expulsion of a passenger from a train for refusal to pay fare, when he has a ticket entitling him to ride, clearly shows that the verdict in this case is much greater than has been allowed to stand. Verdicts, in such cases, which have been sustained, as not excessive, range from $50 to $800. The following cases have been examined: (1) Where the judgment was less than $500: Railway Co. v. Howerton, 127 Ind. 236, 26 N. E. 792; Railway Co. v. McDonough, 53 Ind. 290; Railroad Co. v. Johnson, 67 Ill. 312; Railway Co. v. Wilkes, 68 Tex. 619, 5 S. W. 491. (2) Where the judgment was $500: Gorman v. Southern Pac. Co., 97 Cal. 1, 31 Pac. 1112; McGinness v. Railway Co., 21 Mo. App. 399; Railway Co. v. King, 88 Ga. 443, 14 S. E. 708; Du Laurans v. Railroad Co., 15 Minn. 51 (Gil. 29); Boster v. Railway Co., 36 W. Va. 319, 15 S. E. 158. (3) Where the judgment was over $500, and not exceeding $800: Railway Co. v. Myrtle, 51 Ind. 566; Railway Co. v. Fix, 88 Ind. 382; Railroad Co. v. Milligan, 50 Ind. 393; Graham v. Railroad Co., 66 Mo. 536. In the following cases judgments were held to be excessive: (1) For sums of $500 and under: Railroad Co. v. Cunningham, 67 Ill. 316; Huntsman v. Railway Co., 20 U. C. Q. B. 24; Finch v. Railroad Co., 47 Minn. 36, 49 N. W. 329; McLean v. Railway Co. (Minn.) 52 N. W. 966. (2) For the sum of $1,000: Railroad Co. v. Parks, 18 Ill. 460; Railroad Co. v. Vanatta, 21 Ill. 188; Railroad Co. v. Peacock, 48 Ill. 257; Goins v. Railroad Co., 59 Ga. 426; Railway Co. v. Chisholm, 79 Ill. 585. (3) For sums above $1,000: Railroad Co. v. Slusser, 19 Ohio St. 157; Railroad Co. v. Griffin, 68 Ill. 500; Doran v. Ferry Co. (City Ct. Brook.) 19 N. Y. Supp. 172; Cunningham v. Power Co., 3 Wash. St. 472, 28 Pac. 745; Palace-Car Co. v. Reed, 75 Ill. 125; Railroad Co. v. Weaver, 16 Kan. 456; Quigley v. Railroad Co., 11 Nev. 351.

In several of the cited cases the facts were entirely different from the case at bar. In some the plaintiff suffered no indignity or insult. In others the plaintiff was at fault, but greater force was used in expelling the plaintiff than was necessary. In a few cases the plaintiff was expelled at a place where there was no station, the conductor acting in violation of the laws of the state where such expulsion occurred. In others more or less actual violence was used. In all of these particulars the cases are not directly in point. But several of them are in many essential respects similar to the present case. In nearly all the cases where the courts declared the verdicts to be excessive a new trial was granted without any discussion as to what amount would be proper for the jury to award. In the very nature of the cases, it would

be impossible to state any general rule upon the subject, as each case would have to be decided upon its own peculiar facts and circumstances. It is well settled, however, that the court should never interfere upon the sole ground that the verdict is greater than the court would have given. It is the province of the jury to determine the amount. In assessing the damages in cases of this character, there is naturally a wide divergence of opinion among jurors. Some latitude must be allowed to the jury in fixing the amount upon a fair, just, and reasonable basis. Unless it is clearly shown, to the satisfaction of the court, that the jury, in the determination of the case, were influenced by passion, prejudice, or some improper motive, the court ought not to interfere; but where it is apparent that the jury were governed by such influences, or acted under a misapprehension of their duty or of the facts of the case, it is not only proper, but it is the duty of the court, to interfere. It is evident that the jurors in this case were not misled as to their duty in the premises. The court charged the jury to take into consideration the fact that the ticket constituted a contract between plaintiff and defendant; that by the terms of the ticket the plaintiff was required to identify himself as the original purchaser thereof, by writing his name, or by other means, when so required by the conductor or agents of the railroad; that the conductor had the right, and it was his duty, to require the plaintiff, if there were doubts as to his identity, to sign his name and make such other proof as was proper, in order to identify himself as the holder of the ticket; that they should consider whether the conductors, or either of them, exceeded their duty in this respect,—whether they offered any insults or indignities, or simply made the necessary inquiries; that the conductors, in acting upon appearances, were acting at the peril of the corporation, and that if it afterwards turned out, as it did in this case, that they acted upon an erroneous impression as to the facts, then, no matter how much they were mistaken, nor how honestly they may have acted under the belief that plaintiff had not paid for his ticket, nor how little force was used in ejecting plaintiff, the act was nevertheless unlawful and wrong, and for any injury which the plaintiff received he is entitled to full compensation and nothing more.

It was contended by defendant's counsel that no indignities, other than the mere fact of expelling plaintiff from the car, were shown by the evidence; that the remarks made by the first conductor, to the effect that it looked like the plaintiff was lying, or had forged the ticket, were provoked by the language and conduct of the plaintiff himself. The jury evidently did not accept this view. There was some slight conflict in the testimony, but the jury were fully justified in accepting the plaintiff's version as to what occurred. By referring to the testimony, it will be observed that the conductor was at fault. It was his duty to be courteous, polite, and civil. The plaintiff was explaining to him in a respectful manner that he was the original purchaser of the ticket; that his name was J. M. Zion; that his signature on the ticket was not signed in the usual manner owing to the fact that there was but

little space in the window of the office, and said to the conductor that if the ticket was given back to him he would write his name the same as it is written on the ticket, whereupon the conductor said, "No, you can't fool me that way." Here is a direct insinuation that plaintiff was not acting honestly; that he was trying to deceive the conductor; that he intended to fool him by imitating the signature. With such an insinuation, it was natural for the plaintiff to reply, "Probably you think I am lying about it, or forged it," and the thought of the conductor when he told the plaintiff, "You can't fool me," found expression in the answer, "It looks like it." The language of the conductor cast reflection upon the honor and integrity of the plaintiff, and must have been so considered by the other passengers who heard all the remarks. It is unnecessary to review the evidence as to what occurred at Colfax. As to everything that passed between the first conductor and the plaintiff, it may be conceded that the plaintiff was not entirely free from blame. It is perhaps true that if the plaintiff had not become excited, and had thought of his hatbox, with his name printed thereon, and the cuffs, with his initials, and had searched his valise for letters, and had exhibited all these proofs, the conductor would have been satisfied, and no further trouble would have occurred. But the plaintiff was not to blame for becoming excited. In McGinness v. Railway Co., supra, the conductor, after taking the ticket from the passenger, told him that the ticket was forged or tampered with, and, if he did not alter it, somebody else did. The court said: "This was a most unmanly innuendo, wholly unwarranted by the circumstances, and grossly offensive and insulting to any gentleman of ordinary sensibility and pride." Any man of spirit would naturally become excited under such circumstances. To a man of ordinary sensibility and self-respect, it is always humiliating, in the presence of others, to be arraigned by a conductor about his right of passage. The indignity is much greater when statements affecting his honor, integrity, and truthfulness are directly or impliedly made. Moreover, the first conductor was at fault in refusing to return the coupon from "Los Angeles to Ogden," thus depriving the plaintiff from making satisfactory proof of his right to travel thereon. Under the rules of law heretofore announced, the defendant is responsible for the indignities offered by its agents to plaintiff while a passenger upon its train, as well as for the act of expulsion therefrom. The acts and conduct of the two conductors cannot be segregated, as was suggested by counsel for defendant, and the act of the second conductor, who expelled plaintiff from the train, alone be considered. All damage sustained by plaintiff as the direct and natural consequence of the fault of the first conductor in refusing to give plaintiff the coupon from "Los Angeles to Ogden," or a check as evidence thereof, was a proper matter for the consideration of the jury. Yorton v. Railway Co., 62 Wis. 367, 21 N. W. 516, and 23 N. W. 401; 2 Sedg. Dam. § 865. Notwithstanding the fault of the first conductor in this respect, the second conductor ought not to have put the plaintiff

off, if the proofs offered to him were of such a character as to satisfy him that the plaintiff was entitled to ride. Railway Co. v. King, 88 Ga. 443, 14 S. E. 708.

But the question still remains as to whether or not the verdict for $1,700 is excessive. The jury was especially admonished by the court that the damages must be confined to a reasonable compensation, and that nothing could be added as punitory damages, by way of punishment. It is impossible to reconcile the verdict with the charge. The jury must have been actuated to some extent, at least, by a bias or prejudice against the defendant. On no other theory can the amount of the verdict be explained. While the court is disposed to allow great latitude in the assessment of damages, in cases of this character, it is unwilling to give its sanction to any excessive verdict. As was said by the supreme court in Railroad v. Parks, 18 Ill. 460:

"We cannot hesitate to say that the damages allowed are grossly * * * excessive. Although, in a case of this kind, this court will interfere with a verdict with great reluctance, yet we will not hesitate to do so where it is apparent at first blush that the jury have misapprehended the law of the case, or misunderstood the facts, or else have been influenced by their passions or their prejudices rather than the law and the facts. It is not the duty of courts to enforce the arbitrary edicts of juries, but it is their duty to firmly and fearlessly stand between the party and the jury whenever it is manifest that the party has been made a victim to their prejudices. In this class of cases great latitude should no doubt be allowed to juries in their estimate of the damages, but to this there must be a limit; and, should we refuse to interfere in this case, it would be equivalent to saying to juries, in all cases of this kind, 'We will shut our eyes to the facts of the case, and let you work your will with all parties placed in your hands. Now, do with them as you please. We will not interfere.'"

Juries must be made to understand that an excessive verdict is really prejudicial to the plaintiff in the action, resulting in delays and in new trials, involving unnecessary loss of time and additional and useless expense. In consideration of all the facts, after a thorough review of the authorities, it is ordered that the motion for a new trial be, and the same is hereby, granted, unless the plaintiff, within five days, remits the amount of damages in excess of $850, and if the same is remitted the new trial will be denied.