JAMES B. JOHNSON, PLAINTIFF IN ERROR, VS. THE PENSACOLA AND PERDIDO RAILROAD COMPANY.

1. A demurrer to pleas reaches the declaration, notwithstanding a previous demurrer to the declaration overruled. Where a party pleads over after demurrer overruled, the demurrer is waived, and, in contemplation of law, ceases to be a part of the record.

2. The Pensacola and Perdido Railroad Company is a common carrier. At common law such common carrier cannot charge excessive or unreasonable rates of freight. The common law protects the individual from extortion and limits the carrier to a reasonable rate, but there is no common law rule requiring equal rates. What is charged one person, and the tariff of rates, are but matter of evidence to determine whether a charge is a reasonable compensation for the service performed.

Writ of error to the Circuit Court for Escambia county.

The plaintiff in error, who was plaintiff in the Circuit Court, sued the defendant in error in an action of assumpsit. The declaration contained several counts, but a non-suit having been taken as to all but the first count, this count

alone and the pleadings and proceedings relating to it constitute the case before this court.

The first count alleges that the defendant being a common carrier of lumber and other merchandise between Perdido bay and Pensacola bay, in the county aforesaid, and as such carrier bound by law to furnish the like transportation at the same rates of freight to all shippers by its railroad, did, in disregard and violation of its legal duty and obligation, compel the plaintiff to pay to the said defendant, between the 1st day of July, A. D. 1874, and the 1st of March, A. D. 1877, fifty cents per thousand feet on 4,400,000 feet of lumber shipped by plaintiff over said railroad, making an aggregate of $22,000 in excess of what the said defendant charged the Perdido Bay Lumber Company for like transportation over said railroad during *the said period between 1st day of July, A. D. 1874, and 1st of March, A. D. 1877,* and that thereby the said defendant became indebted to the plaintiff in the said sum of $22,000 ; and being so indebted, the defendant afterwards, to wit : on the 1st day of March, 1877, promised to pay to the plaintiff the said sum of $22,000 ; but although often so requested to do hath hitherto wholly refused to do.

To this count the defendant demurred. The court below, at special June Term, 1877, (upon condition that plaintiff should so amend his declaration as to make it clearly appear that the excess of the charge to plaintiff over the charge to the Perdido Bay Lumber Co. was made during the same time,) overruled the demurrer, but with leave to the defendant to demur to the amended declaration.

The plaintiff having so amended his declaration, by adding the words italicised above, the defendant demurred to it as amended, and set forth the following grounds of demurrer :

The declaration as amended does not state facts sufficient to constitute a cause of action, in this :

It does not state that the transportation, though like in kind, was furnished under like circumstances.

It does not state that defendant charged plaintiff anything it was not entitled to, under the laws of this State.

It does not state or show that, by action of defendant with the Perdido Bay Lumber Co., the plaintiff was injured.

That to state that defendant charged the Perdido Bay Lumber Co. less than established rates, does not raise an implied promise on part of defendant to refund any part of established rates that the plaintiff may have paid.

This demurrer was overruled, and the defendant excepted.

Defendant then filed six pleas. The 1st and 2d denied the alleged indebtedness and promise.

The 3d alleged that the charge to plaintiff of fifty cents per thousand in excess of what defendant charged Perdido Bay Lumber Co., was not for transportation under the same or similar circumstances; was not for the same amount of business, and was not in excess of the regular, legally established rates for the transportation of lumber.

4th. That the charge to plaintiff was the regular established rate for the transportation of lumber, and the charge of fifty cents less to the Perdido Bay Lumber Co. was not intended to be, and was not in fact, a discrimination against plaintiff, or in favor of the Perdido Bay Lumber Co., and was not made to damage the one or to benefit the other, and did not damage the plaintiff.

5th. That the less charge to the Perdido Bay Lumber Co. was for a good and valuable consideration for the benefit of the defendant, and was not an unreasonable or unjust discrimination between the plaintiff and the Perdido Bay Lumber Co., and was not for the purpose of benefiting the Perdido Bay Lumber Co., or prejudicing the plaintiff.

6th. That long before the plaintiff acquired any interest in mill property at Millview, or at any place on defendant's

road—and before said road was built and completed—and as the only means by which defendant could build and complete its road, the Perdido Bay Lumber Co., then known as R. F. Queal & Co., loaned to defendant upon very inadequate security a large sum of money, to be repaid in freight, to enable defendant to complete its road ; and as an inducement to said loan, and as consideration therefor, said defendant, under the advice and counsel of its then principal director and legal adviser, one learned in law, and believed by defendant to be, of all men, the one who had most at heart the interest of defendant, to-wit: on the 16th day of February, A. D. 1872, agreed, for and during a period of ten years, from the date of the first shipment of lumber by the Perdido Bay Lumber Co., to make a deduction of one-third from the regular rate of freight on lumber that might be produced by any mill or mills which said Perdido Bay Lumber Co. would erect at Millview, or by one or both of two at that time unproductive mills at Millview, if said Perdido Bay Lumber Co. should purchase one or both of said mills.

That the regular established rate of freight was and is $1.50 per M. feet; and that defendant has, in pursuance of its contract, made deduction of one-third thereof, to-wit: fifty cents per thousand feet, for and in consideration of said loan as part compensation therefor, and also in consideration of the said Perdido Bay Lumber Co. furnishing defendant a great amount of business. All of which more fully appears from the copy of said agreement, which is hereunto annexed, marked " X," and made part of this plea.

That said plaintiff, after the making of said agreement, purchased and commenced operating his said mill on defendant's road at Millview, and on the 2d day of March 1874, entered into a contract, which, among other provisions, expressly provided, that he should be charged the regular established rate of freight of one dollar and fifty cents per

one thousand feet for lumber transported on other than plaintiff's cars, as fully appears from a copy of said contract hereunto annexed, marked " Y," and made part of this plea.

And defendant avers that all the lumber, for the transportation of which plaintiff has been charged $1.50 per thousand feet, was transported on other than plaintiff's cars.

The following are the agreements referred to :

### (X.)

STATE OF FLORIDA, }
  Escambia County.  }

This contract, entered into this the 16th day of February, A. D. 1872, by and between the Pensacola and Perdido Railroad Company of the first part, and Robert F. Queal & Co., of Chicago, of the second part, witnesseth :

That whereas, the extension of the said railroad from its present terminus on Bayou Chico, into Pensacola bay, is of vital importance to the party of the first part, and to the owners of mills at Millview ; and whereas, the party of the second part is willing to make a loan of $10,000 to the party of the first part, upon the considerations, conditions and security hereinafter mentioned, in order to enable the party of the first part to make said extension ; now, therefore, the said parties do hereby mutually contract and agree as follows, to-wit :

First. The party of the second part, for and in considera- tion of the undertakings hereinafter specified, of the party of the first part, does hereby agree to lend the party of the first part the sum of $9,000, in addition to the sum of $1,000 which has this day been paid to the party of the first part, making in all the sum of $10,000, and the remaining $9,000 the party of the second part contracts and agrees to pay the party of the first part, in installments, as the work of ex- tending said railroad progresses, and upon a notice of ten days, to be given by the party of the first part to the party

of the second part, that such installments are required. And it is mutually agreed by the said parties that the said loan of $10,000 shall bear interest at the rate of ten per cent. per annum on each installment thereof, from the day it was received by the party of the first part; and that said loan shall be satisfied by the retention of twenty per cent. of the amount of the freight money which may become due by the party of the second part to the party of the first part, and at the expiration of every ninety days during the period the said loan shall be unsatisfied, the aggregate retention of freight money shall be ascertained and applied as a payment *pro tanto* of such loan and accrued interest; provided, however, that if said retention of freight money should not prove sufficient to discharge said loan, with the interest thereon, within three years from the date of the first installment thereof, then and in that case the said loan shall become due and payable, with interest thereon as aforesaid, by the party of the first part to the party of the second part.

Second. That as a part of the consideration for said loan of $10,000, the party of the first part agrees and contracts to transfer to the party of the second part twenty-five (25) shares of the stock of the said Pensacola and Perdido Railroad Company, immediately after the payment of the last installment of said loan of $10,000.

Third. That as an additional consideration for the loan of ten thousand dollars as aforesaid, the party of the first part does hereby contract and agree, for and during a period of ten years from the date of the first shipment of lumber by the party of the second part over said road, to make a deduction of one-third from the regular rate of freight on lumber that may be produced, at the option of the party of the second part, to the extent of thirty millions, or under, annually, by any mill or mills which the party of the second part may, at their option, erect at Millview or either or both of the mills now erected on mill lots five (5) and six (6) in

the plan of Millview, in said county and State, (in case the party of the second part should in their discretion see fit to purchase either or both of said mills on said mill lots five and six,) from said mill or mills to the terminus of said railroad in Pensacola bay, after the completion of the extension of said railroad as hereinafter provided ; and it is hereby understood and agreed that the regular rate of freight above mentioned, and from which said deductions of one-third shall be made, shall· be as announced to mill owners at the commencement of said railroad enterprise, one dollar and fifty cents per thousand feet, board measurement, free of wharfage on lumber and vessels, and that said rate shall be and remain the regular rate of freight during the whole of said period of ten years.

Fourth. That the party of the first part, for and in consideration of the said loan of ten thousand dollars, hereby contracts and agrees and binds itself to complete within eight months from the date hereof, no act of God preventing, the extension of said railroad from its present terminus on Bayou Chico into Pensacola bay, as far as eighteen feet of water, according to the survey of said railroad now on file in the office of the party of the first part ; and it is hereby understood and agreed that in the event of the failure of the said party of the first part to complete said extension as aforesaid, that then and in that event the said loan of ten thousand dollars, with interest thereon as aforesaid, shall become due and payable, and as security for the completion of said extension within the time above specified, as well as security for the loan as aforesaid, and the repayment of the same in the event of the failure of the party of the first part to complete the same within the time above specified, the party of the first part has this day executed to the party of the second part a second mortgage on the said railroad, the real and personal property, and the franchises of the party of the first part.

Fifth. That the party of the first part hereby contracts and agrees at its own expense to provide the necessary switch, or track, to connect the said mill or mills of the party of the second part with the main line of said railroad.

Sixth. That in case of a failure to complete said railroad as above provided, then and in that case all provisions of this contract shall continue and be in full force for the period so stipulated, except as to the maturity of the loan of ten thousand dollars.

P. & P. R. R. CO.,

By B. F. SIMMONS, President.

ROBERT F. QUEAL & CO.

(Y.)

This agreement entered into this 2d day of March, 1874, between the Pensacola and Perdido Railroad Company of the first part, and J. B. Johnson of the second part, witnesseth:

That the party of the second part hereby covenants and agrees to place upon the road of the said company, party of the first part, five (5) new cars similar to those now owned by the party of the first part in operating their road.

The party of the second part further agrees to keep said cars in good repair to the satisfaction of the Superintendent of said road.

It is further agreed that said cars are to be used in the transportation of the produce of the said party of the second part, and under the regulations of said company as to the manner and quantity of loading such cars. That in consideration of the above stipulations the party of the first part agrees to transport over their road the produce of said mill of the party of the second part, loaded upon said cars, at the rate of one dollar per thousand superficial feet.

It is further understood and agreed that the above stipulated rate of freight, viz: of one dollar per thousand feet,

applies only to the five cars owned by the party of the second part, and not to products loaded on other cars at said mill, on which the regular established rate of freight of one dollar and fifty cents per thousand superficial feet will be charged.

It is further mutually agreed that this contract is to continue in full force until the said railroad company purchases said cars at the original cost, less any needed repairs on the same, upon giving the said party of the second part six months' notice of their intention to purchase the same.

It is further mutually agreed that the party of the second part shall have the privilege of placing five more cars on the road, on the same terms as heretofore stipulated, and as soon as the said ten cars are placed upon the road, in working order and ready for use, it is further agreed between the said parties that in case of emergencies in the business of either they will endeavor to aid each other to meet such emergencies by a loan of cars or trucks, provided that upon request such loan can be made without interfering with the business of the party to whom the request shall be made.

P. & P. R. R. CO.,

Per B. F. Simmons, President.

J. B. JOHNSON.

The plaintiff joined issue on the 1st and 2d pleas to the first count, and demurred to the 3d, 4th, 5th, and 6th pleas to that count, and assigned the following grounds of demurrer, viz:

To the third plea:

1st. Facts are not stated showing the discrimination was lawful.

2d. The amount of business done by the plaintiff and the Perdido Bay Lumber Company, respectively, is not stated.

3d. Discrimination cannot be legally justified on mere difference in amount of business.

4th. There can be no legally established rates, when one rate is not applied to all persons for like service.

To the fourth plea:

1st. One dollar and fifty cents could not be the regular rate for plaintiff, if one dollar was the rate for the Perdido Bay Lumber Company for like service.

2d. The intention not to act illegally cannot make unlawful discrimination legal.

To the fifth plea:

1st. The consideration is not set forth so as to enable the court to judge of its sufficiency.

2d. It is not shown how the consideration was a benefit to the plaintiff.

3d. It is not stated that plaintiff accepted such benefit as an equivalent for the discrimination against him.

4th. No facts are set forth showing that the admitted discrimination was lawful.

5th. The purpose for which an unlawful discrimination is made cannot make it legal.

To the sixth plea:

1st. The contract of the Perdido Bay Lumber Company and defendant, so far as it undertook to authorize a discrimination in favor of said company and against other shippers, was void, as being against public policy, and contrary to law.

2d. Defendant could not, by contract with the Perdido Bay Lumber Company, disable itself to discharge its legal duty as common carrier to furnish plaintiff with like transportation at like rates of freight as it furnished and charged said comaany.

3d. The contract between plaintiff and defendant of 2d of March, 1874, only required plaintiff to pay $1.50 as the regular and established rate; and it could not, in law, be such rate, since it was not charged to the Perdido Bay Lumber Company as well as to plaintiff.

The court overruled the demurrers, and the plaintiff not desiring to plead over, and taking a non-suit as to all the counts of his declaration, except the first count, final judgment was entered for the defendant. Plaintiff sued out a writ of error, and assigns for error the overruling the demurrers to said 3d, 4th, 5th and 6th pleas, and giving judgment thereon for defendant.

*R. L. Campbell* for Plaintiff in Error.

The Circuit Court, in overruling the demurrers to the 3d, 4th, 5th and 6th pleas to first count of the declaration, committed the errors assigned.

The main questions of law involved in the case were decided upon the demurrers to the declaration, and to that decision defendant submitted by pleading over. Ellison vs. Allen, 8 Fla., 206.

The decision embraced four propositions :.

1st. That defendant, being a common carrier of lumber and other merchandise, was guilty of an unlawful discrimination in compelling the plaintiff to pay 50 cents more freight per M. feet of lumber than it charged the Perdido Bay Lumber Company for like transportation during the same period of time.

2d. That such discrimination was an infraction of the common right of all citizens to demand and have like transportation, during the same time, at one rate of freight, for the like article.

3d. That such discrimination was an injury to the plaintiff to the extent of the excess of 50 cents per M. feet, which he was compelled to pay, over and before what was charged to the Perdido Bay Lumber Company.

4th. That such excess of 50 cents per M. feet was so much money illegally obtained from plaintiff, and for which he could maintain an action of assumpsit.

In support of the 1st, 2d and 3d propositions may be cited: Chicago & Alton R. R. Co. vs. People, 2 Railway R., 242; 67 Ill., 11; McDuffie vs. Portland, &c., R. R., 52 N. H., 430; New England Express Co. vs. Maine Central R. R. Co., 57 Maine, 188; Messenger vs. Pennsylvania R. R. Co., 7 Vroom, 406; Camblos vs. Phila. & Reading R. R. Co., 4 Brewster, 563; Indianapolis, &c., R. R. Co. vs. Rinard, 46 Ind., 293; Andenreid vs. Phila. & Reading R. R. Co., 68 Penn. St., 370; Vincent vs. Chicago & Alton R. R. Co., 49 Ill., 33; Eclipse Tow Boat Co. vs. Pontchartrain R. R. Co., 24 La. An., 1; Shipper vs. Penn. R. R. Co., 47 Penn. St., 338; Chicago, B. & Q. R. R. Co. vs. Park, 18 Ill., 460.

"A common carrier is a public carrier. He engages in a public employment, takes upon himself a public duty, and exercises a sort of public office." McDuffie vs. Portland, &c., R. R. Co., *supra.*

"The very definition of a common carrier excludes the idea of the right to grant monopolies, or to give special and unequal preferences." New England Express Co. vs. Maine Central R. R. Co., *supra.*

"The commonness of the right necessarily implies an equality in the sense of freedom from unreasonable discrimination." Ibid.

"And such equality embraces terms, facilities and accommodations; and any practical invasion of the common right, by an unreasonable discrimination practiced by a carrier, held to the common service, is insubordination and mutiny, for which he is liable to the extent of the damage inflicted, in an action of case at common law." Ibid.

"A service, or price, that would otherwise be reasonable, may be made unreasonable by an unreasonable discrimination in violation of the common right." Ibid.

"It is in vain to say in defence of such discriminations made without a just cause, that the rate of charges against

the injured person or locality is a reasonable rate, and therefore no injury is done." Chicago, &c., R. R. Co. vs. People, *supra.*

Carrying for a reasonable compensation must imply that the same compensation is accepted always for the same service, else it could not be reasonable, either absolutely or relatively. 2 Redfield on Railways, 96.

5th. The rule of compensation furnishes the measure of damages. Sedg. on Damages, 32, 33, 36.

To compensate plaintiff, he must be placed where he would have been but for the discrimination against him; that is to say, he must be reimbursed the 50 cents per M. feet of lumber, with interest for the use of his money.

The law of equality required that plaintiff's enjoyment of the common right should be measured by that of any and ever other citizen's enjoyment of the same right; and his loss is what he is compelled to pay more than any other citizen for the like service.

Plaintiff had a right to demand that his transportation should be at the same rate as that of the Perdido Bay Lumber Company; and, if he was charged 50 cents more per M. feet of lumber, that excess is necessarily the measure of his loss.

The rule is neither arbitrary nor artificial, but harmonizes with the actual business result—gain to the favored company, and loss to the disfavored individual.

Cost of transportation is a large factor in estimating the value of a ponderous article like lumber. Starting in the race of competition with an advantage of 50 cents per M. feet, that advantage will be maintained by the favored company in every market and every sale.

Illegal toll extorted by a toll-keeper may be recovered in an action of assumpsit. Brown's Actions at Law, 537.

Money illegally demanded and paid under the pressure of immediate and urgent necessity may always be so recovered.

Sasportis vs. Jennings, 1 Bay, 470; Astley vs. Reynolds, 2 Strange, 916; Parsons on Contracts, 392.

Do the 3d, 4th, 5th and 6th pleas state any facts which avoid the case made by the first count of the plaintiff's declaration, which the court had adjudged to be well founded in law, and is so fully sustained by reason and authority?

The third plea is bad.

1st. It does not state facts showing that the discrimination alleged in the declaration was lawful.

The statement, that the transportation was not under like or similar circumstances, does not satisfy the rule of pleading, which requires " a clear and distinct statement of the facts which constitute the cause of action or ground of defence, so that they may be understood by the party who is to answer them ; by the jury who are to ascertain the truth of the allegations, and by the court who are to give judgment." 1 Chitty Pl., 233.

No circumstance is stated, showing in what respect the transportation was unlike or dissimilar.

There is no traverse of the allegation of the declaration that both the greater and less rates were charged "for like transportation," i. e., for the same articles and for the same distance. But whilst the plea, impliedly, admits that the two charges cover "like transportation " of lumber, it pleads in avoidance that the circumstances, under which such "like transportation " occurred, were not alike or similar; and thus, whilst it fails to traverse the declaration, it also fails to state the dissimilar " circumstances " under which the two rates were applied, although such circumstances constitute the matter in avoidance.

2d. If difference in amount of business done on defendant's road by the plaintiff, and Perdido Bay Lumber Company, respectively, is one of the circumstances relied upon to make the discrimination lawful, the plead is bad; be-

cause it does not state which was the larger shipper, or how much was shipped by each.

3d. But a mere difference in the amount of business of two shippers cannot justify a discrimination ; for if so, a difference of one bale of cotton, barrel of flour, or 1,000 feet of lumber between two shipments, would enable carriers to discriminate between shippers, and thus defeat the rule of equality.

4th. And lastly, the plea is bad, because it assumes that there can be a regular rate which applies to one shipper and not to another, for like transportation ; and, that assumption is made, too, in the teeth of the decision of the court on the demurrer to the first count of the declaration. Chicago, &c., R. R. Co. vs. People, *supra.*

The fourth plea is bad.

1st. For the reason assigned for the last objection to the third plea. Again, in denying that there was any discrimination in fact, whilst admitting those circumstances which, in the judgment of the court, presented a case of discrimination, the plea not only raised a mere question of law, but one which had already been disposed of in a previous stage of the case.

2d. Whilst admitting the illegal act, and the resulting injury to the plaintiff, implied by law, the plea alleges, in avoidance of both, the absence of intention to discriminate against or to injure the plaintiff.

"In civil actions the law does not regard the intent of the actor, but the loss or damage of the party suffering." Auburn, &c., vs. Douglass, 12 Barb., 557 ; Ecker vs. Moore, 2 Chand., 85 ; Keith vs. Howard, 24 Pick., 392 ; Lacy vs. Swartout, 10 Peters, 81.

The fifth plea is bad.

1st. The consideration is not so set forth as to enable the court to judge of its sufficiency, in the sense of being a legal and adequate consideration for an act affecting the

public duties and obligations of the defendant as a common carrier.

In ordinary cases the rules of pleading require the consid-- eration to be stated. (1 Chitty Pl., 194.) Still more im- portant is it, that the consideration should be shown where the agreement affects, not only the interests of the parties to it, but those of the public also.

2d. It is not shown how the consideration was a benefit to the plaintiff.

Consideration and benefit are equally unspecified.

3d. It is not even suggested that plaintiff accepted the · unnamed benefit as an equivalent for the discrimination · against him.

4th. No facts are set forth showing the admitted discrim-- ination to be lawful, *i. e.*, reasonable and just; but the plea again raises the question of law, which the court had de-- cided upon the demurrer to the first count of the declara- tion.

5th. The purpose for which an unlawful act of discrimi- nation is made cannot make it legal.

The court had already decided the discrimination to be both unlawful and injurious to the plaintiff. And according to · the authorities above cited, good intention neither legalizes the one nor compensates the other.

The sixth plea is bad.

In it are disclosed the "circumstances," "considerations," "benefits," and "established rate," faintly shadowed and, "antithetically mixt" in the 3d, 4th and 5th pleas.

The contract with R. F. Queal & Co., which is made a part of the plea, discloses the fact that at its date the de- fendant's road was operating between Perdido bay and Bayou Chico, an estuary of Pensacola bay; that mills, de- pendent on it for transportation, had been built and were in operation; that defendant was engaged in the business of a common carrier; and that a "regular rate" of freight on

lumber had been announced to mill owners at the commencement of the enterprise.

1st. This contract, so far as it provided for a discrimination in the rate of freight in favor of R. F. Queal & Co., and against other shippers, was void as being contrary to law and public policy. 2 Parsons on Con., 748 ; Railroad Company vs. Lockwood, 17 Wall., 357.

The law required defendant to have a regular, that is to say, uniform rate, applicable to all shippers.

The contract bound defendant to destroy that uniformity and regularity of rate by making it inapplicable to R. F. Queal & Co. ; and in effect, fixed the rate of freight for them at $1, and for other shippers at $1.50.

It is just such discrimination as the contract provides for that the Circuit Court, and the authorities above cited, declare to be illegal.

Indeed, every discrimination rests upon a contract, express or implied, between the favored shipper and the carrier.

To plead, then, that the discrimination in this case rests upon a contract between the favored shipper and the defendant, is simply to show that it rests, like other agreements, upon the consent of the parties to it.

That the contract was not implied or verbal, but in writing, and under the seal of defendant, may make the wrong more deliberate, but cannot make it right.

The objection does not, nor does this case require it to go to the extent of denying the obligation of the contract as between the parties to it. The impeachment for illegality begins at the point where it touches the public, which was not a party to it. Peoria, &c., R. R. Co., vs. Coal Valley Mining Co., 2 Am. Railway Cases, 295.

The complaint is not that R. F. Queal & Co. are charged less than was announced to mill owners at the inception of the enterprise, nor that the charge of $1.50 is not extended

to them, but that the freight on lumber having been reduced for them to $1, the law of equality and common right forbade defendant to charge other shippers more than this reduced rate.

2d. Ground of demurrer.

A common carrier cannot disable himself to perform any of his legal duties. Peoria, &c., R. R. Co., vs. Coal Valley Mining Co., *supra*; Railroad Co. vs. Lockwood, 17 Wall., 357; Hartford, &c., R. R. Co., vs. New York, &c., R. R. Co., 3 Rob., 411; 7 Vroom, 406.

The contract prevents defendant from exercising towards all shippers the impartiality demanded by the rule of common right.

It prevents defendant for ten years from lowering its rate of freight on lumber, even though its condition and business might justify such reduction.

In so doing it divests itself of its public office of common carrier, and becomes a private carrier; for its public duty is made subservient to the interest of one shipper.

Besides plaintiff's contract with the defendant, hereafter to be discussed, three circumstances are relied upon to legalize the discrimination on which this action is founded.

1st. The discrimination was a part of the consideration for the loan of $10,000, which was necessary to finish defendant's road.

Admitting defendant's pecuniary necessities, and considering also the right of Queal & Co. to demand, and defendant to make, a reduction on its lumber freight to them, as a part consideration for the required loan, the question arises, what obstacle is there to defendant's making a like reduction to the public, in order to meet the demand of the law of equality, springing from the common right?

The money was obtained, the road completed, and the lender got, besides his interest, mortgage, and bonus in stock, the required reduction in freight.

The public demand is confined to a like reduction to all shippers.

To this demand it is replied, defendant is bound for ten years to make no reduction to the public.

The objection comes, not from the favored shipper, but the carrier.

And his plea, in answer to the public demand for equality of rates, founded upon common right, is, that defendant must discriminate, because he has contracted to do so.

In a word, it cannot practice the equality which the law demands, because it has agreed to exercise that inequality which the law forbids.

Such is the ultimate proposition upon which the plea rests, viewed in the light of the authorities already cited.

But there are other considerations which prevent defendant's pecuniary necessities from having any bearing on the question of discrimination.

Defendant having derived its existence from a charter of this State involving the exercise of the right of eminent domain, is a public corporation. Olcott vs. Supervisors, 16 Wall., 678 ; Acts 1868, 151 ; 13 Fla., 704.

That charter is a contract between the State and the defendant, by which the latter bound itself to build and operate the road for the public; not only as the consideration for the corporate being and other franchises bestowed upon it, but because that public character was and is, and must ever be a constitutional condition of its existence. R. R. Com'r. vs. P. & O. C. R. R. Co., 63 Maine, 268 ; Olcott vs. Supervisors, *supra* ; Sanford vs. Railway Co., 24 Penn., 378.

The defendant's road, therefore is, and always has been, a public highway. Ibid.

In the use of that highway all citizens have an equal interest, and must be treated alike. Messenger vs. Pennsyl-

41

vania, &c., R. R. Co., 7 Vroom, 406, and authorities above cited.

The $10,000 was, in fact, borrowed from Queal & Co. to enable the defendant to execute its part of the contract with the State—to build and maintain its road for the equal use, in every regard, of all citizens.

Can the pecuniary straits of defendant be accepted as a justification of a breach, or change in the terms or spirit of its contract, without the consent of the State, supposing the State to be competent—which is at least doubtful—to bind the public by such consent, to submit to an unequal, partial and discriminating enjoyment of a common right?

2d. That the discrimination was "in consideration of the said Perdido Bay Lumber Company furnishing defendant with a great amount of business."

The contract contradicts this statement; for it only provides for lumber that may be manufactured to the extent of 30,000,000 feet or under, and therefore the discrimination applied to any quantity short of the 30,000,000.

Besides, we have no comparative statements of the quantity shipped by plaintiff and the favored company, and, therefore, the argument is but fair that we have no such statements, because they would not sustain defendant's case.

But to justify discrimination on the ground of the mere difference in the amount of business done by shippers would be to make the effect justify the cause.

For to say that for like transportations, one mill, one cotton shipper, or one town, shall be charged less freight than another, is a sure way of enabling it to ship more than such other. The carrier would decide the race of competition before it begun. But this feature of the plea does not touch the objection which lies at the root of a discriminating rate.

The essence of discrimination is, that you do for one shipper what you will not do for another.

Here the rate was reduced one-third, in consideration of a great amount of business, as it is pretended. Now, if a "great amount of business" was to be obtained from one shipper by a reduced rate, why might not another "great amount" be procured from another shipper by a like reduction? But the contract absolutely forbids, for ten years, any reduction to any other shipper.

It is patent, therefore, on the face of the contract itself, that it was not "a great amount of business" to be secured that prompted the arrangement, but an undue advantage to be conceded to Queal & Co. over and above all other shippers.

In respect to the express undertaking, not to do for others what was done for Queal & Co., this case stands alone in the history of discrimination.

3d. That contract was entered into long before plaintiff acquired any interest in mill property on defendant's road.

It is a sufficient answer to this point, that the contract was void at its inception, so far as it touched the rights of the public, of which plaintiff is one.

Again, plaintiff's rights, as one of the public, to use defendant's road at such such time as he saw fit on like terms as any other citizen, is something derived from the State, which the defendant can neither abridge nor destroy.

The third ground of demurrer alleges that the contract between plaintiff and defendant required plaintiff to pay $1.50, "as the regular established rate," but that $1.50 was not such rate, since the Perdido Bay Lumber Company was not required to pay more than $1.

The plea admits that plaintiff contracted to pay $1.50, as the "regular established rate;" but relying on the order of time in which the contracts were executed, without venturing, however, to charge upon plaintiff notice of the Queal & Co. agreement, it insinuates, rather than charges, that

plaintiff's undertaking was to pay $1.50 absolutely, when he shipped on defendant's cars.

As plaintiff's contract makes no reference to the Queal & Co. contract, and he had no notice of it, the latter can have no bearing on the construction of the former.

As $1.50, according to the plea, had been announced to mill-owners as the regular and established rate, so it is recognized in plaintiff's contract.

The end and object of plaintiff's contract was to enable him to facilitate his transportation by putting five cars on defendant's road, and to fix the rate of freight on them, and not to fix the rate of freight when defendant's cars were used, for the contract assumes this rate to be already "established."

The reference to the $1.50 rate was made, not for the purpose of incorporating it into, but excepting it from the operation of the contract, and, at most, it is but a recognition of what was the regular rate at the date of the contract, and perfectly consistent with the case presented in the first count of the declaration.

The contract is dated 2d March, 1874. The discrimination complained of began, according to the declaration, on 1st July, 1874.

Consent, that on 2d March, 1874, $1.50 was the regular established rate, is no recognition of it as such rate on and after 1st of July, 1874, when it had become an irregular, partial, discriminating, and, therefore, illegal rate.

Again, if this feature of the contract is viewed, not as an exceptional clause, or mere recognition of an existing rate, but as an agreement to pay $1.50, as "a regular established rate," the agreement involves two obligations. Defendant contracts that $1.50 shall be the regular established rate, that is to say, the uniform rate required by the common right, and applicable to all shippers. The plaintiff contracts to pay that rate, not absolutely, but conditionally, upon its

remaining such "regular established rate." The undertakings are dependent, and the agreement expresses only the correlative right and duties of the parties as prescribed by law.

To an action on the contract by defendant against plaintiff for freight at the rate of $1.50, would it not be a good plea in bar that at the time the same was reduced, $1.50 had ceased to be the regular established rate?

To read the agreement as an undertaking to pay $1.50, absolutely and unconditionally, the words "regular established rate" must be blotted out.

To retain them is to exclude the idea of any but a common and equal rate, applicable to all shippers.

"Regular" implies uniformity, according to rule or law. "Established" implies fixed, settled. Is that rate uniform which applies to one man and not another? Can that be settled and fixed in law which is contrary to law?

This construction of plaintiff's agreement is in harmony with its language and the rules of law which it embodies, whilst it is consistent with the legal duties and obligations of defendant as a common carrier, whose contracts are always construed so as to make them accord with those duties and obligations. The St. Louis, &c., Railway Co. vs. Smuck, et al., 49 Ind., 302.

Any other construction would work the grossest injustice to plaintiff; for when he shipped on his own cars, (the use of which it is fairly inferrable from the agreement was worth to defendant 50 cents per M. feet of lumber,) he would be charged the same rate as the Perdido Bay Lumber Company, which relied on the defendant's cars exclusively. On the other hand, when plaintiff shipped on defendant's cars he would be charged 50 cents more than that company, and thus, in either case, he would be the object of hostile, and the company of favorable, discrimination to the extent of 50 cents per M. feet, a difference sufficient to break him

down in the race of competition, especially on a low market.

This action is for the 50 cents excess of the discriminating charge when plaintiff shipped on defendant's cars, between 1st of July, 1874, and 1st March, 1877. And the following is a summary of the principles on which it rests:

Equality is the measure of the enjoyment of a common or public right, as it is of the burdens of such enjoyment.

The maximum enjoyment of such right conceded to one for a given charge, is the minimum enjoyment to which another can be restricted for a like charge.

On the other hand, the minimum charge fixed for a given amount of enjoyment by one, is the maximum charge that can be exacted from another for a like enjoyment.

And a contract between the manager of such public right, or use, with one party, to change that measure of enjoyment or burden is as futile, as against the public, as would be the attempt to bind the rights of C. by a contract between A. and B.

Nor can the impecuniosity of such manager be pleaded as a justification in such case, any more than it could be available as a defence for the breach of any other legal obligation.

*E. A. Perry* for Defendant in Error.

The plaintiff claimed the right to recover back, by an action of assumpsit, fifty cents per thousand feet, or one-third of the amount paid for three years' transportation of lumber upon defendant's cars and road; not because that amount is in excess of the "tariff or charges adopted" by defendant; not because the charges were unreasonable, but simply on the ground that defendant transported lumber for another party at less than its tariff and less than a reasonable charge.

Such is plaintiff's case without defendant's pleas.

JUNE TERM, 1878.          647

Johnson v. Pensacola and Perdido R. R. Co.—Argument of Counsel.

It is true that to consider the case as presented by plaintiff's declaration alone involves a consideration of the propriety of the Circuit Court overruling defendant's demurrer to it, and that defendant by reason of having plead, could not avail itself of the error to reverse a judgment against itself; but here the plaintiff seeks to reverse a judgment, and to do so he must show that he is entitled to a different judgment.

He is not entitled to different judgment unless his declaration so entitled him. This court, then, may at the outset, and without inquiring into the sufficiency of defendant's pleas, refuse to reverse the judgment, because of the insufficiency of plaintiff's declaration to sustain a different judgment.

To hold that plaintiff's declaration would support a judgment in his favor, the court must hold that defendant, by carrying for the Perdido Bay Lumber Company at one-third less than its tariff rate, became indebted to the plaintiff in one-third of the amount received for the three years' service. Had defendant carried for Perdido Bay Lumber Company for nothing, then it would have become indebted to the plaintiff in the whole amount paid it for transportation; and this without any allegation that plaintiff was in any respect injured by defendant's liberality to the Perdido Bay Lumber Company.

This is very different from a case where a carrier had charged a customer more than its adopted tariff, or more than a reasonable rate, which party had paid under protest. In such case he might, probably, by action recover back the over-charge, or if carrier's rates are limited by statute, and the carrier charges and the customer pays beyond the limit.

The defendant's demurrer to the declaration was overruled mainly upon the authority of Chig. & Alton R. R. Co. vs. People, 2 M. Amer. R. R. cases, 282, and McDuffie vs. P.

& R. R. R. Co., ib., 261, cases dependent upon statute; but great stress being laid upon loose observations, as to the common law requiring absolute equality of charge, from which was deduced the proposition that a naked charge that a carrier had carried for one customer at a less rate than for another, was a charge of unlawful discrimination, and imposed upon the carrier the duty of denial or justification.

Such, perhaps, may be the case under the statutes of many of the States, and under the statutes of England, as for instance the Railway Traffic Act, 17 and 18 Vict., c. 31, which prohibit inequality of charges; not, however, under any statute or the common law in force in this State.

The common law limited carriers to a reasonable charge, (3 Taunt., 264,) but imposed upon them no obligation to charge equal rates to all their customers. Baxendale, et al. vs. The Eastern Counties Railway Co., 4 C. B., (N. S.,) 63–79; Fitchburg Railway Co. vs. Gage, 12 Gray, Mass., 393, 398–9.

Adopting the line of argument of Chief Justice Taney, in Bank of Augusta vs. Earle, 13 Peters, 519, 591, we say the very fact that the acts prohibitory of discrimination are passed in England, would of itself show that the common law is not as claimed by plaintiff, and the language of those prohibitory acts most clearly indicate that the acts forbidden by them might lawfully have been done before those laws were passed.

As I understand the authorities so much relied on by plaintiff, they do not go beyond this: That a less charge to one customer than to another, for like transportation under the same or similar circumstances, is an unlawful discrimination.

Those very authorities hold that a mere difference in amount charged does not constitute a discrimination; and the derivation and meaning of the word show that such dif-

JUNE TERM, 1878.          649

Johnson v. Pensacola and Perdido R. R. Co.—Argument of Counsel.

ference is but one element that goes to make up what is understood and meant by the word; much less does that mere difference constitute an "unlawful," i. e. an "unjust and unreasonable" discrimination.

To hold the facts alleged in the declaration sufficient to authorize a judgment for the plaintiff, would be to hold that any railroad in the State which has carried passengers or freight free, thereby has become indebted and liable in an action upon promises to such parties as have paid fare or freight for the whole amount of the earnings.

Should the court determine that the insufficiency of the declaration cannot now be insisted upon by the defendant, or considered by the court; or if it be considered, and there is any doubt in the mind of the court as to whether it would sustain a different judgment, there can be but little difficulty in sustaining the judgment when the declaration and pleas are considered together.

Were there statutes here, as in many other States and in England, prohibiting discrimination, the pleas set forth a full defence.

The 3d plea denying the existence of a necessary constituent of a discrimination, denies a discrimination; much more does it deny an "unlawful discrimination."

"Circumstances alter cases;" make the circumstances different and you make the cases different. To compel a common carrier, because licensed by the State, to treat all cases, however different, in identically the same way, would be like compelling the doctors, because they are licensed, to administer to all parties identically the same medicine, regardless of different symptoms and circumstances. When the plaintiff, by his demurrer, admits the 3d plea, he admits there was no discrimination, lawful or unlawful.

By admitting the 4th plea, he admits that he was not damaged by the action of defendant. The suit is solely for

damages, and by his demurrer to 4th plea he admits he has no cause of action.

The purpose of the 5th plea is to negative any charge or implication that the defendant charged the fifty cents less in discrimination between the Perdido Bay Lumber Co. and the plaintiff, and to that end the plea alleges that the less charge was made for the benefit of defendant and not to benefit the Perdido Bay Lumber Co., or prejudice the plaintiff, and therefore was not an " unreasonable, unjust, or unlawful discrimination." Nor would it have been under the strict statutes in force in England. Nicholson vs. Great Western Railway Co., 5 C. B., (N. S.) 366.

The 3d, 4th and 5th pleas, then, negative the existence of those facts upon which the courts in the cases cited by plaintiff held the carriers guilty of unjust, unreasonable and unlawful discrimination.

Possibly some of those pleas might be objected to, as equivalent to the general issue; but that objection cannot, under our practice, be reached by demurrer.

As to the 6th plea.

The plaintiff's main argument to support his demurrer in the court below was, that this plea is bad because the contract " X," which is attached to show the consideration that took the place of the fifty cents less charge to the Perdido Bay Lumber Co., is, as he claims, void as against public policy, inasmuch as it seeks to bind defendant to do an unlawful act; that is to keep the regular and established rate of freight at $1.50.

Whether or not that contract is wholly good, or wholly or in part bad, as a contract; whether or not it does in law bind defendant to do what it contracted to do, it is not necessary to discuss. That question in no way affects this case or the sufficiency of the plea.

This plea fully sets forth the consideration which defend-

.JUNE TERM, 1878. 651

Johnson v. Pensacola and Perdido R. R. Co.—Argument of Counsel.

ant received in lieu of the fifty cents per thousand feet for freight.

Admit, if plaintiff so desires, that the contract is bad; the $10,000 is not bad; there is nothing void in that.

And it is not material whether or not the Perdido Bay Lumber Co. could force the defendant to carry its lumber and make the agreed deduction, although it paid the $10,000 for freight in advance and built up a large business for defendant. The only question is, did considerations move from the Perdido Bay Lumber Co. to defendant, so that defendant was justified in, and benefited by, securing that money and that business upon the terms of the agreement?

Was there any consideration which supplied the place of the fifty cents per thousand feet? Was not the payment in advance, and long in advance, a consideration?

Admit that the contract was ineffectual to bind the company, for the reasons urged by plaintiff, still there remains the fact shown by the contract, or paper, or whatever it may be called, that the defendant was induced to remit fifty cents per thousand feet, in consideration of the use of $10,000, which the lender could only hope to get back by doing what defendant was at that time moving heaven and earth to have done, that is, by building up a large business for the road.

So as to the contract between plaintiff and defendant: it may be a void contract in every particular urged by the counsel for the plaintiff; yet the plea is a good plea, and the contract fulfills the part allotted to it. It shows defendant could have had no intention of discrimination in favor of the Perdido Bay Lumber Co., and against the plaintiff; of attempting to build up one and keep down the other, as argued by plaintiff. It shows that plaintiff well knew defendant's established rates of $1.50, and that he, in consideration of certain advantages, (the privilege of putting his

own cars on the road and transporting upon them at less rate) voluntarily contracted to pay that established rate for freight shipped on defendant's cars.

Plaintiff having thus for a consideration voluntarily contract to pay the rates and prices he has paid, by what principle does he now come and claim the right to recover that money back, without any allegation of fraud, undue advantage or concealment?

Plaintiff makes no complaint of invidious discrimination in allowing him fifty cents deduction from the adopted tariff, in consideration of his furnishing cars for the road, which (inasmuch as defendant had the right to become the owner of said cars by refunding to the plaintiff the cost thereof) was one form of making a loan to defendant, but the cry comes in when the Perdido Bay Lumber Co. is allowed the same in consideration of its furnishing the money necessary for defendant's very existence.

The plaintiff discerns a great difference between freight being carried on his cars, and another customer's money.

That the consideration and inducements for the less charge to the Perdido Bay Lumber Co. would be sufficient, under the most strict laws against discrimination, is seen by a careful examination of the plaintiff's own authorities, and by reference to Nicholson vs. Great Western Railway Co., 5th C. B., (N. S.) 366, reviewed and reaffirmed in 7th C. B., (N. S.) 755.

If a full defence under the statutes prohibitory of unequal charges, can it be questioned that they constitute a defence under the laws of this State, by which defendant, though limited to a reasonable charge, is under no obligation to charge equal rates to all its customers?

Defendant confidently submits that the record does not show that plaintiff is entitled to a different judgment, and that the judgment of the Circuit Court should be affirmed.

The word "unlawful" in the declaration does not supply

want of allegation of such facts as would make the acts charged against defendant a discrimination.

"Charging A. less than B. for the same service, or service of the same nature, is not, of itself, necessarily charging A. too little or B. too much." See authority so much relied on by plaintiff. McDuffie vs. R. R., 52 N. H., 453.

If plaintiff is not injured, he has no cause of action. 52 N. H., 451-453.

The simple allegation of unequal charge, then, does not set forth facts sufficient to constitute an action, unless by the common law in force in this State there is positive prohibition of a mere nominal inequality.

The cases cited by plaintiff to show that a mere naked inequality of price is *prima facie* unreasonable and undue preference and discrimination, as far as defendant's counsel could catch his citations, (he not being furnished with any list of them as required, I understand, by rule of court,) are all cases under State statutes, and the court will see that these cases hold that "neither the service nor the price is necessarily unreasonable because it is unequal in a certain narrow, strict and literal sense."

The question is not merely whether the service or price is absolutely unequal in the narrowest sense, but also whether the inequality is unreasonable and injurious. McDuffie vs. R. R., 52 N. H., 451.

By what rule of pleading then can the mere charge in the declaration of naked inequality in price be held sufficient to constitute an action?

So much in reply to plaintiff's argument to the sufficiency of the declaration.

It is clear from careful examination of the authorities relied upon by plaintiff that even under those authorities the declaration does not entitle plaintiff to a different judgment, much less then can it do so under the law of this State, which is the common law of England, concerning which the

courts of England will be considered the best interpreters. If the law of the State requires modification to protect the people against corporations, defendant has no fear but that this court will leave it to the Legislature to make that modification.

But if we admit the declaration sufficient, and admit that the common law, and that is the law of this State, imposes upon common carriers the obligation to charge equal rates to all their customers, the pleas come in and deny the inequality, for they show that the defendant received as much benefit for its service from the one customer as the other. The $1 paid to defendant, February 16, 1872, for service to be rendered July 1, 1874, was equal to $1.50 charged to plaintiff and paid at the time of service. Where, then, is the inequality of price? It is no more of an inequality than if one customer had paid for his freight one dollar in gold worth one dollar and a half, while plaintiff paid in currency worth only par.

By reference to the two contracts attached to the pleas, it will be seen that defendant was not only ready to extend, but actually has extended to the plaintiff the same or similar privileges. In consideration of plaintiff's loaning five cars he gets reduction upon a great part of his shipments, the same as that allowed to the lender of the money, and to this day he may get the same reduction on all his shipments by availing himself of the privilege extended to him of loaning the defendant five more cars.

The court cannot fail to observe the difference between contract X. and the contract in Messenger vs. Penn. R. R. Co., (7 Vroom, 407,) cited by plaintiff, and the only case in which it does not appear that any State statute figured.

In the contract in that case it does not appear that there was any payment in advance, or other circumstances that made the less price for which the railroad company had

agreed to carry plaintiff's goods equal to the prices charged to others.

In contract X. there were circumstances and considerations which made the nominally less charge to the P. B. L. Co. equal, if not greater than the adopted tariff charged to plaintiff.

So even in a suit by the P. B. Lumber Co. vs. defendant, under contract X., it is by no means clear the contract would not be enforced. But in this case the contract is not pleaded as a contract, but is an exhibit attached to plea to show the circumstances of defendant, which made the payment of $1 long in advance equal to $1.50 paid when service was rendered. The allegation of the plea that the less charge was in consideration of the Perdido Bay Lumber Co. furnishing defendant a great amount of business, if not proved clearly by the contract attached, is an allegation of fact which may, if denied, be proved by any competent testimony. There is certainly nothing in contract X. which proves that the P. B. Lumber Co. has not furnished a great amount of business. And the contract upon its face shows that only by furnishing a great amount of business to defendant could the P. B. L. Co. expect to be repaid the $10,-000 advanced by it to defendant. Does the exhibit then so contradict the allegation of the plea as to neutralize it?

In view of the charge by plaintiff's attorney that defendant's attorney traveled out of the record in stating incidentally the paternity of contract X., and in justice to defendant's attorney, he invites the court's attention to the allegation in 5th plea as to this matter.

If plaintiff's counsel did deny in the court below the truth of the allegation in the plea, defendant's counsel did not hear the denial, and it certainly does not appear of record. He did hear an explanation of it, but understood the counsel to admit that he framed the contract, and he did not

deny that he occupied the position in the company which the plea allots to him.

These remarks are made to exonerate the defendant's attorney from the charge of traveling out of the record.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

This writ of error is prosecuted here by James B. Johnson, the plaintiff in the Circuit Court. What he questions first, as a matter of practice, is the correctness of the ruling of the Circuit Court upon the demurrer to defendant's pleas. The defendant before filing its pleas had demurred to the declaration, and the court had overruled the demurrer. To the pleas then filed the plaintiff demurred, and the first question in the case to be determined is, does this demurrer reach the declaration, or, the declaration having been sustained by the court in overruling defendant's demurrer thereto, does this action of the court fix the law of the case, and, upon demurrer to the plea, prevent this court or the Circuit Court from going back to the declaration?

The plaintiff in error here maintains that it does, and insists that the only question is, admitting the declaration to be good, is this a good plea? The only case brought to our attention in this connection is the case of Ellison, Adm'r, vs. Allen, 8 Fla., 209. There this court held that a defendant in the Circuit Court, and appellant here, could not avail himself of his demurrer, abandoned in that court, by his pleading over when it was overruled.

We will state the principles of law controlling this subject as applicable to that case, as well as to this. Upon the interposition of the demurrer of the defendant to plaintiff's declaration, going as it did to the sufficiency in law of the matter stated as a foundation for the action, the judgment consequent upon the overruling the demurrer was a judgment *quod recuperet*. This was the strict common law rule.

(Tidd's Prac., 657.) This rule has been varied in most of the State courts, as well as in the courts of the United States. The general rule is now that even after the court has announced its judgment to be that the declaration is good in law, the defendant is permitted to withdraw his demurrer, to plead *de novo*, and thus avoid a final judgment against him. In this State the statute provides (act of Nov. 23, 1828, Thomp. Dig., 331,) that "no demurrer, either at law or in equity, shall be considered as an admission of the facts set forth in the pleadings demurred to, so as to debar the person demurring from any substantial claim or defence which he might have urged if said demurrer had not been filed," and the constant practice upon the circuit is, upon overruling a demurrer to a declaration, to permit the defendant to plead to the merits. When, however, he pleads to the merits he must withdraw his demurrer, and the consequent final judgment *quod recuperet*, which is the only known form of judgment which can follow overruling a general demurrer to a declaration, is not entered. This is the reason why a defendant, if he pleads over after judgment against him upon his demurrer to the declaration, is held to waive his demurrer. In such cases courts of error, controlled by the common law practice, treat the record as not containing any such judgment or demurrer—treat the case as if no demurrer had been filed. This, in view of our statute, is eminently just and proper. The statute takes from the plaintiff, so far as defendant's pleading is concerned, all advantage of the judgment in his favor upon defendant's demurrer to his declaration ; and as to the defendant, it very properly provides that his case shall stand as "if said demurrer had not been filed." This is the reason why the appellant in the case referred to by the plaintiff in error here (8 Fla., 209,) was not permitted to assign for error the judgment of the court upon his demurrer. This court in that case says, if he desired to have that ruling reversed he should

have refused to go to the country, and have permitted the judgment on the demurrer to stand. The only authority cited by this court in that case for the view there announced was the case of the United States vs. Boyd, 5 How., 51. There the Supreme Court of the United States says, "The withdrawal of the demurrer and going to issue upon the pleading operated as a waiver of the judgment. If the defendants had intended to have a review of that judgment on a writ of error, they should have refused to amend the pleadings and have permitted the judgment on the demurrer to stand." The Supreme Court of the United States is somewhat more explicit in the language used in the later cases covering this subject. In the United States vs. Vigil, 10 Wall., 423, that court says, "The filing of a plea to the merits after the demurrer was overruled, operated as a waiver of the demurrer. The pleading was thus abandoned and ceased thenceforth to be a part of the record." In Young vs. Martin, 8 Wall., 357, the same court, in speaking of this subject says, "They thus abandoned their demurrer, and it ceased to be a part of the record."

With this explanation and statement of the true grounds of this action of the court and of the Supreme Court of the United States, in cases where the plaintiff in error seeks to question a judgment of the court of original jurisdiction overruling a demurrer after he has plead over, we ask what is the result of its application here? The rule being that such a demurrer and judgment is, in contemplation of law, no part of the record, or if it is strictly a part of the record it is waived, then the general rule that upon plaintiff's demurrer to the defendant's pleas, the sufficiency of the declaration is brought in question must operate, for the simple reason that there is nothing to prevent its operation. The record stands as if originally there was nothing but the declaration, the plea and the demurrer thereto. Why should the defendant be held to have waived his demurrer, and the

plaintiff be given all advantage of it in the same manner as if not waived ? How can it be held that a demurrer can be considered as withdrawn for one party and not for the other ? The law has no such anomalies. If it is withdrawn it is withdrawn for all parties, and that is the end of it.

This, our conclusion, reasoning from elementary principles of pleading, is sustained, without exception, by the cases which we have been able to find covering the precise point. In Cumming vs. Gray, 4 Stew. & Port., 397, the Supreme Court of Alabama says, " That where a demurrer to a declaration containing no substantial cause of action has been overruled and the defendant pleads over, a second demurrer may well be extended back to the declaration." To the same effect are the cases reported in 13 Ala., 265, and 13 Ala., 490–500, and the like rule is announced by the Supreme Court of the United States in 7 Wall., 93. Our conclusion as to this point is that the demurrer to the plea reached the declaration, notwithstanding a previous demurrer to the declaration overruled, and that upon the argument of the demurrer to the plea, the record was to be treated in just the same manner as it should have been if no demurrer to the declaration was ever filed.

The next question in order in view of this conclusion is, do the facts set forth in this declaration constitute in law a cause of action ?

The facts here alleged are that the defendant, a common carrier, compelled the plaintiff to pay to the defendant, between the first day of July, A. D. 1874, and the first day of March, A. D. 1877, fifty cents per thousand feet on 4,400,-000 feet of lumber shipped by plaintiff over said railroad, making an aggregate of $2,200 in excess of what the said defendant charged the Perdido Bay Lumber Company for like transportation over said railroad during the said period, between the first day of July, A. D. 1874, and the first of March, A. D. 1877.

Under the charter of this company it has the general power "to levy and collect tolls from all persons, property, merchandise, and all other commodities transported" on its road. There is no statute in this State regulating the matter of freights and charges by railroad companies. It is not denied that this company is a common carrier. We must, therefore, look to the common law for the settlement of the question involved.

The fact here stated is, that defendant compelled plaintiff to pay for lumber shipped over its road fifty cents per one thousand feet more than it charged another party for transporting lumber over its road at the same time, and the plaintiff insists that this difference of fifty cents was an illegal charge, and that he is entitled to judgment for $2,200, having been compelled to pay freight at that rate and in this manner on 4,400,000 feet of lumber.

The question here is, what was and is the extent of the obligation of a common carrier at common law to the public, when viewed in reference to charges for tolls and freights?

In Peck vs. North Staffordshire Railroad Company, decided in the House of Lords in 1863, (10 Ho. Lords cases, 511,) Mr. Justice Blackburn says: "A common carrier is bound to carry for a *reasonable remuneration.*" In one of the earliest cases upon the subject (Bastard vs. Bastard, 2 Show., 81,) it is said that "where there is no agreement as to price," (and this is really the best method by which to fix the common law right,) "the carrier might have a *quantum meruit* for his hire." This means simply that he could recover the value of his service. In Harris vs. Packard, 3 Taunt., 264, it is said: "A carrier is bound by law to carry everything which is brought to him for a reasonable sum to be paid to him for the same carriage, and not to extort what he will." We cannot say that the carrier is bound to carry anything beyond articles of such class as he is under a legal

obligation to carry, (3 Story, 34,) but it is unquestionably true that his charge must be "reasonable." So in Comyn's Digest we find it announced that in the absence of an agreement for a price certain, the common carrier may have a *quantum meruit.* 1 Com. Dig. C., citing 1 Sid., 36.

In the case of the Citizens' Bank vs. The Nantucket Steamboat Company, 2 Story, 35, Mr. Justice Story, speaking of the hire or recompense of common carriers, remarks that "it may be in the nature of a *quantum meruit.*" The same view is announced in 5 Wend., 340, and in 5 Wend., 350.

Says Parke B., in Pickford vs. The Grand Junction Railroad Company, 8 M. & W., 378 : "The carrier is bound to receive the goods on the money being paid or tendered, and the bailor to pay the reasonable amount demanded." In 2 Steph. N. P., 978, it is said "common carriers are bound to receive and carry the goods of the subject for a reasonable reward." In 1 Duval, 146, the Court of Appeals of Kentucky says : "A common carrier cannot, like a merchant or mechanic, consult his pleasure or caprice as to the conduct of his business. The law makes it his duty, when he can conveniently do so, to receive and carry goods for any person whatsoever for a reasonable hire."

Under the English decisions a warehouseman, having by virtue of an act of Parliament a monopoly of his business, is, as to rates of compensation which he can demand, placed upon the same footing as a common carrier. He is bound by law to receive goods into his warehouse for *a reasonable price and reward.* The principles which underlie this rule, as announced by Lord Hale, are stated by the English courts as the basis of their conclusions as to this matter. So in a case in the Supreme Court of the United States, (4 Otto, 134,) where it proposed to state the common law on the subject, the views of Lord Hale, and these decisions of the courts of England, are cited as giving the true rule.

In Allnut and another vs. Inglis, Treasurer of the Lon-

662 SUPREME COURT.

Johnson v. Pensacola and Perdido R. R. Co.—Opinion of Court.

don Dock Company, (12 East, 527,) Lord Ellenborough says that according to Lord Hale, "wherever the accident of time casts upon a party the benefit of having a legal monopoly of landing goods in a public port, as where he is the owner of the only wharf authorized to receive goods, which happens to be built in a port newly erected, he is confined to take reasonable compensation only for the use of the wharf. Lord Hale puts the case either way ; where the King or a subject have a public wharf to which all persons must come who come to that port to unlade their goods, either because they are the wharves *only licensed* by the Queen, or because there is *no other wharf* in that port, *as it may fall out ;* in that case (he says) there cannot be taken arbitrary and excessive duties for cranage, wharfage, &c., neither can they be enhanced to an immoderate rate, but the duties must be reasonable and moderate, though settled by the King's license or charter." And then he assigns this reason, "for now the wharf and crane and other conveniences are affected with a public interest and they cease to be *juris privati* only." Lord Ellenborough then says : "Here the company's warehouses were invested with the monopoly of a public privilege, and, therefore, they must by law confine themselves to take reasonable rates for the use of them for that purpose." Le Blanc, J., in the same case, after stating that the act of Parliament confines the privilege to the company's warehouse, enquires : "Is it not the privilege of the public, and shall not that which is for the good of the public attach on the monopoly, that they shall not be bound to pay an arbitrary but only a reasonable rent ?" and then answers his own enquiry by declaring that "in case of dedication to such a purpose as this " (that is, where private property is affected with such a public interest,) " the owners cannot take arbitrary and excessive duties, but the duties must be reasonable. That principle was followed up in the case of Bolt vs. Stennett, (8 Term Reports,

606,) for there the quay being one of the public quays licensed under the statute of Elizabeth, it was held that the owner was bound to permit the use of the crane upon it and could not insist either that the public should not use the crane at all, or should use it only upon his own terms, but that he was bound to permit the use of it upon reasonable terms." In the same case like views were expressed by Bayley, J.

It cannot be questioned that the reason why a common carrier is restricted to reasonable rates is the same that causes the limitation at common law upon the rates to be charged by a wharfinger licensed under a statute. (Munn vs. Illinois, 4 Otto, 129–30.) In reference to a railroad company it may be truly said that it exercises a *quasi* public employment. While railroads are managed for private benefit and the profits resulting from their operation go to individuals, yet they are treated as merely a public convenience and agency in the matter of State and inter-State commercial intercourse. It is the public character attached to them which, under certain circumstances, authorizes taxation for their construction, as a tax for a private purpose is unconstitutional; and it is the like public nature of their functions which enables them to become the objects of a legislative grant to take the property of an individual for their use, paying a reasonable compensation therefor.

We have exhausted the material at our hands in the endeavor to ascertain the result of the English cases upon this question. We can find in England or the United States no case involving the precise point here involved, which is, whether, at common law, the defendant, a common carrier, is responsible to the plaintiff for the excess charged him upon the like material and during the same time over a charge for like freights for like material during the same time made of another.

In the case of the Fitchburg Railroad Company vs. Gage

664 SUPREME COURT.

Johnson v. Pensacola and Perdido R. R. Co.—Opinion of Court.

and others, (12 Gray, 393,) the Supreme Court of Massachusetts held "that a railroad corporation is not obliged as a common carrier to transport goods and merchandise for all persons at the same rates." In speaking of the common law rule, that court says: "It requires equal justice to all. But the equality which is to be observed in relation to the public and to every individual *consists in the restricted right to charge in each particular case of service a reasonable compensation and no more.* If the carrier confines himself to this, no wrong can be done and no cause afforded for complaint." The claim made in this case arose out of a difference between the freights upon plaintiff's ice and the price charged others upon the same *class* of freights. It was not upon the same material, but the court treated the case as involving the same principle. It based its conclusion upon the ground that the plaintiff did not set out a case of *excessive or unreasonable charge.* In the last edition of Story on Bailments, we find the rule of the common law thus stated: "At common law a common carrier of goods is not under any obligation to treat all customers equally. He is bound to accept and carry for all upon being paid a reasonable compensation. But the fact that he charges less for one than for another is only evidence to show that a particular charge is unreasonable; nothing more. There is nothing in the common law to hinder a carrier from carrying for favored individuals at an unreasonably low rate or even gratis." In support of this doctrine the following cases are cited: 12 Gray, 393; 2 P. C., 237; 4 C. B., (N. S.) 78; 12 C. B., (N. S.) 74. While the text is the reasonable deduction from remarks in these cases, still, with the exception of the case reported in 12 Gray, they were (so far as we have been able to examine them) cases arising under statutes. Most of the cases treat of the common law rule strictly as between the parties, and without comparison as to the charges against others, the cases where legislative action is

being construed and is controlling, being omitted as not being in point. The cases stating the common law rule are simply that the charge must be reasonable. Thus far there cannot be any reasonable difference between fair minds. In the next place, the right to have the service of the common carrier at a reasonable rate is *common*. Upon a tender of a reasonable compensation, unless there is a reasonable ground for his refusal, in case of refusal he will be liable to an action. Under such circumstances he must receive and carry all goods offered for transportation (which it is his duty to transport,) by *any persons whatever*, upon receiving a suitable hire. Looking to the cases, and rejecting as we always must *theories of judges* based upon ill defined definitions and outside of the facts before them, the term "common" in this connection is used as contra-distinguished to private or exclusive. It means a public carrier as distinct from a private carrier—a carrier simply *pro hac vice*. As to whether a carrier is public or private is the method by which you measure his responsibility. In case of loss or damage to goods by a carrier, the grounds of the difference of the responsibility depend upon whether he is a public or a private carrier. The cases in England and the United States show that the term common as applied to carriers means simply *public* as distinct from *private*. The term common does not measure the extent of the right of each or its nature. It simply means that whatever is the right of one is the right of all, without proposing to define what is the right of any, except that the term common as applied to carrier involves the duty and obligation to undertake the service, while the term private as applied to carrier involves discretion in the matter. (2 Stephens N. P., 962.) Common carriers are " carriers for hire indifferently for all persons." " Those who are engaged in the business of carrying for all who apply, indiscriminately, upon a particular route, by whatever mode of transportation they conduct their busi-

666 SUPREME COURT.

Johnson v. Pensacola and Perdido R. R. Co.—Opinion of Court.

ness, must be regarded as common carriers; while those who undertake to carry in a single instance, for a particular person, not being engaged in the business as a general employment, even for a portion of the time, must be considered private carriers." (4 Harr., 448; 1 Pick., 50; 2 Red. on Rail., 5 Ed., p. 5, and cases cited.) Says Chancellor Kent, " common carriers undertake generally, and not as a casual occupation, and for all people indifferently, to convey goods and deliver them at a place appointed, for hire as a business, and with or without a special agreement as to price." (1 Salk., 249; 8 Carr. and P., 207; 3 Barb., 388; 2 Kelly, 353.) Says Nisbet, J., (in the case last cited,) when treating of the distinctions between a common and private carrier: " If he refuse to carry he is liable to be sued and to respond in damages to the person aggrieved, and this is perhaps the safest test of his character." Says Mr. Justice Story, (Story on Bailments, 495,) after speaking of his general obligations, " a common carrier has therefore been defined to be one who undertakes for hire or reward to transport the goods of such as choose to employ him, from place to place." (1 Wend., 272; 2 Story, 17; 25 Penn. St., 120.) In the last case the terms common and public are used as synonymous words. It is useless to multiply quotations to determine the signification of the term common in this connection. It is used not to define, to limit, or explain the degree or amount of compensation which can be demanded for the service to be performed. Indeed, as to the amount of compensation which can be demanded, the rule as to public and private carriers is the same. It is a *quantum meruit*. True, the responsibility, the risk of the public carrier is greater, and that fact may possibly enter into the estimate of the value of the service. That, however, would simply increase the damages, on account of the different degrees of responsibility attending the several bailments. It would not vary the rule.

Our conclusions are that, as against a common or public carrier, every person has the same right; that in all cases, where his common duty controls, he cannot refuse A. and accommodate B.; that all, the entire public, have the right to the same *carriage for a reasonable price, and at a reasonable charge for the service performed;* that the commonness of the duty to *carry for all,* does not involve a commonness or equality of compensation or charge; that all the shipper can ask of a common carrier is, *that for the service performed he shall charge no more than a reasonable sum to him;* that whether the carrier charges another more or less than the price charged a particular individual, may be a matter of evidence in determining whether a charge is too much or too little for the service performed, and that the difference between the charges cannot be the measure of damages in any case, unless it is established by proof that the smaller charge is the true reasonable charge in view of the transportation furnished, and that the higher charge is excessive to that degree. The obligations in this matter must be reciprocal. Where there is no express contract, the common law action by the carrier against the shipper is for a *quantum meruit,* and the liability of the shipper is for a reasonable sum in view of the service performed for him. What is charged another person, (in this case the amount charged the Perdido Bay Lumber Company,) or the usual charge made against many others (the freight tariff) is matter of evidence admissible to ascertain the value of the service performed. In every case the legality of the charge is established and measured *by the value of the service performed,* and not by what is charged another, unless what is charged the other is the compensating sum, in which event it is the proper sum, not on account of its *equality,* but because of the relation it bears *to the value of the service performed* as an adequate compensation therefor. To sum the whole matter up, the common law is that a common carrier shall not

charge excessive freights. It protects the individual from extortion, and limits the carrier to a reasonable rate, and this on account of the fact that he exercises a public employment, enjoys exclusive franchises and privileges, derived, in the case of defendant here, by grant from the State. The rule is not that all shall be charged equally, but reasonably, because the law is for the reasonable charge and not the equal charge. A statement of inequality does not make a legal cause of action, because it is not necessarily unreasonable. It would be a strange rule indeed which would authorize a shipper, after being compelled to pay his freights according to established rates, (this appears from the pleas and declarations,) to look around and find some smaller charge for the same service during the same time, which may be either as a gratuity, or a sale of service at a noncompensating rate, or less than the reasonable charge, and claim his damages according to this difference, based upon an inequality not general in its character, but existing only by virtue of a charge made for the same service against one other person. If this court sanctions the doctrine of absolute equality, and then measures the damages by the difference in the charge as to one person named in a declaration, which does not negative a fair inducement or consideration for the difference, it must sustain such a rule as that stated.

The declaration, to be good in law, must state a case of excessive charge for the service performed. When it simply states a case of inequality of charge, it states no cause of action, for the smaller charge may be less than reasonable, and the greater charge may be exactly the value of the service and the reasonable charge for the transportation furnished.

Whether a charge made by A. against B. is reasonable cannot be determined by establishing the charge against C. for the same service. It is too plain for argument that the higher charge, where there is a difference, may be what is

the compensating sum, and the lower charge may be too small for the service.

In a case of this importance we do not deem it improper to review the cases brought to our attention by the plaintiff in error here. Our attention has been called to the following cases, decided by the Supreme Court of Illinois: The Chicago and Alton Railroad Company vs. The People, 67 Ill., 11; Vincent vs. Chicago and Alton Railroad Company, 49 Ill., 33, and Chicago, B. & Q. R. R. Co. vs. Park, 18 Ill., 460. The first case was an information in the nature of a *quo warranto* based upon the provisions of "an act to prevent unjust discrimination and extortion in the rates to be charged by the different railroads for the transportation of freight on said roads." The question was whether a charge of $5.65 per thousand feet of lumber a distance of 110 miles, while at the same time the company charged $5 per thousand feet of lumber for a distance of 126 miles, did not subject the company to the penalties prescribed by the act. In answer to the information, the company alleged that the higher charge for the shorter distance was a reasonable charge, and that the smaller charge was unreasonably low. Upon demurrer to this answer or plea, the court held that notwithstanding the charter of the corporation was a contract giving general power to prescribe tolls, the Legislature had power to prohibit unjust discriminations; that it did not have the power under the Constitution to prohibit any discrimination, and that "the naked fact that a railway company charged a larger sum for transporting freight of the same class over a given distance than it is charging for the same distance over another part of its road, or in the opposite direction, is not of itself conclusive evidence of an unjust discrimination," and "that a difference of price for the same distance of transportation is not necessarily an unjust discrimination." In the case reported in 49 Ill., the court decided that railroad companies were not at liberty

to discriminate at their discretion in their charges for delivery at different warehouses. The case reported in 18 Ill., 466, was a claim by a passenger for damages for an alleged illegal expulsion at a place not a station. In the later cases in Illinois we find the question of discrimination discussed. In 76 Ill., 67, the court sustained a contract allowing a rebate of 5½ cents less than the uniform tariff per bushel for corn. In 79 Ill., 121, the question of the power of a railroad company, *anterior to this legislation*, to make a contract with a party " for transportation of freight at a less rate than the general public was required to pay," was sustained. The agreement was to transport coal for $3 per car load, the freighter furnishing the cars, while the regular tariff was $9. We do not think the question of equality was involved in any of the Illinois decisions brought to our attention by counsel. The later cases sustaining a difference (76 and 79 Ill.) in the amounts paid for freight, we think are entitled to more consideration. The case reported in 76 Ill. was upon a contract made before any of the legislation against unjust discrimination. The rule for its determination was the common law. It is, therefore, more like this case, and what is there said is entitled to more weight. We consider other cases cited.

The case reported in 57 Maine, 188, was where a railroad company refused to carry the plaintiff's express freight. The case reported in 52 N. H., 430, was upon a statute requiring that " all persons shall have reasonable and equal terms, facilities and accommodations for the transportation of themselves, their agents and servants, and of any merchandise," &c. In speaking of the rule of the common law upon the subject as stated by the English courts, the Supreme Court of New Hampshire in this case says: " We have not overlooked the fact that in England it seems to be supposed that at common law common carriers are not bound to carry all and for all on reasonably equal terms,"

## JUNE TERM, 1878. 671

Johnson v. Pensacola and Perdido R. R. Co.—Opinion of Court.

and that "the fact seems now to be overlooked" (by the English courts) "that the general principle of equality is the principle of the common law." "A mistake of this kind is an evil of some magnitude." This case is under a statute. Not only is this true, but we cannot accept the reasoning of this court, based upon no authority, founded in decisions involving the points discussed, as against what it admits is the rule as announced by the English courts. The English courts announce the rule as it is fixed by the common law cases cited in the beginning of this opinion. The New Hampsaire court fails to pay any attention to these sources of information, and calls the conclusions therefrom a mistake. We think the dictum of the New Hampshire court wrong, and the doctrine of the English courts right.

The case in 68 Penn. St., 370, did not involve the question of equality of charges for transportation. It involved a right of wharfage. The court held that the nature of wharfage required exclusive possession. The case reported in 24 Penn. St., 378, was under the statute incorporating the company, and the court held that under this statute a contract giving to one express company an exclusive right of transportation in the passenger trains was illegal and void. The case cited from 24 La. An., 1, is against the plaintiff. It approves the decision in 12 Gray, 399.

In the case of Messenger, et al. vs. Penn. R. R. Co., 7 Vroom (N. J. L.) 407, it was held that an agreement by a railroad company to carry goods for certain persons at a cheaper rate than they will carry under the same conditions for others is void, as creating an illegal preference. The declaration in the case before us does not make a case of charge for carriage greater against the plaintiff, *under the same conditions*, than a smaller charge was made of the Perdido Bay Lumber Company. It simply sets up that 50 cents per thousand feet of lumber was charged plaintiff beyond what was charged the Perdido Bay Lumber Company

for transportation for lumber at the same time. Nor is there any sanction in this case in New Jersey for the idea that the damages are to be measured alone by the extent of the inequality in the charge. Indeed, in this very case the court say that "the duty of the common carrier was to receive and carry all goods offered for transportation, upon receiving a reasonable hire." This case in New Jersey is to the effect that it is not "admissible for a common carrier to demand a different hire from various persons for an identical kind of service, under identical conditions." The declaration in the case before us does not make this case. It makes a case of difference in charge upon the same kind of freight (lumber) during the same time. The amount of freight to be furnished by the parties may have been different, and there may be other circumstances so unlike in character (*in re* Baxendale vs. The G. W. R. R. Co., 94 E. C. L., 308,) as to control. Independent of these questions, however, the common law rule as we understand it, and we ascertain it by looking to the elementary principles as announced by the English and American courts, and not from any process of reasoning as to what the rule, in our judgment, ought to be, does not require an equality of charge, but only a reasonable charge in view of the service which the party gets and the carrier renders. From the very earliest English cases the measure of the right of the carrier was a *quantum meruit*. The carrier *must receive this if tendered, and must* (with certain defined exceptions) *perform the service*, and the shipper must pay the value of what he gets. Whether as an internal State regulation of commerce equality should be required by the Legislature, is a matter of legislative discretion; at least this court can only enforce the rule of the common law as it finds it, and not as it ought to be. Even as to the power of the Legislature in the premises, however, we say nothing in this case, as it is not involved.

Our conclusion is that the declaration does not contain a legal cause of action, and that the demurrer to the pleas of the defendant reached the declaration, notwithstanding a previous demurrer to the declaration by the defendant had been overruled. The judgment must be affirmed.